544 A.2d 82

Borough of South Greensburg, Petitioner *v.* Pennsylvania Public Utility Commission, Respondent.

Argued May 26, 1988, before Judges COLINS and SMITH, and Senior Judge KALISH, sitting as a panel of three.

*Ralph D. Conrad,* with him, *Dominic Ciarimboli,* for petitioner.

*Linda C. Smith,* with her, *John J. Gallagher,* Assistant Counsel, *John B. Wilson,* Deputy Chief Counsel, *Daniel P. Delaney,* Chief Counsel, for respondent.

*Teri R. Simon,* with her, *John R. Jenchura,* for intervenor, Consolidated Rail Corporation.

OPINION BY JUDGE COLINS, June 28, 1988:

The Borough of South Greensburg (petitioner) petitions for review of an order of the Pennsylvania Public Utility Commission (Commission), dated May 28, 1987, adopting the Recommended Decision of Administrative Law Judge (ALJ) EDWARD R. CASEY and denying the Borough's exceptions thereto.

This matter was initiated by the Borough's filing of a complaint with the Commission on June 12, 1981. Therein, the Borough alleged that the Fairview Avenue Bridge, located within the Borough, was in a state of disrepair. This complaint requested that repairs be made to the bridge structure, the roadway and the sidewalks so as to provide safe and convenient access above the tracks of Consolidated Rail Corporation (Conrail).

Subsequent to an initial hearing, held on October 1, 1981, the Commission entered an order on October 29, 1982, directing the Pennsylvania Department of Transportation (DOT) to prepare a detailed, in-depth inspection report of the structure. This report revealed that the loss of bearing support of the concrete piers and beams had reached a point where representatives of Conrail, the Borough and DOT agreed that the bridge should be closed to all traffic, in the interest of public safety. Therefore, by emergency order dated November 21, 1983, the Commission directed the Borough to barricade the crossing and post a suitable detour for all highway traffic.

A further hearing was held on November 22, 1983 at which the inspection report was considered and where the Borough agreed to explore the feasibility of the construction of an at-grade crossing to replace the existing overhead bridge. Engineering conferences were con-

ducted on December 14, 1983 and February 2, 1984 with representatives of Conrail, the Borough, DOT, and Westmoreland County (County) in attendance. All interested parties were in agreement that the most feasible and practical alternative to the rehabilitation or reconstruction of the existing structure would be an at-grade crossing with automatically operated crossing warning signals.

This alternate proposal was received into the record at a further hearing on June 7, 1984. At this hearing, DOT presented testimony which indicated that as long as DOT's design directives were followed, and the appropriate warning signals were installed at the crossing, it would have no objection to the at-grade crossing proposal. DOT's testimony also indicated that the Bridge Bill[1] would provide $210,000 for the project and that a request had been made for an increase in appropriation from that figure to $700,000. DOT further testified that if the increase was granted, the State's portion of the funding would equal approximately 80% of the total appropriation.

Testimony was also presented by a Borough engineer who had been requested to conduct an engineering study and compile a feasibility plan and cost estimate for construction of an at-grade crossing. This preliminary plan and cost estimate was entered into the record. The estimated cost of construction, including the removal of the existing structure and construction of the new crossing approaches was $548,000.

A witness for Conrail testified that the company had no objection to the construction of an at-grade crossing.

---

[1] This act is commonly known as the Highway-Railroad and Highway-Bridge Capital Budget Act for 1982-83, Act of December 8, 1982, P.L. 848, *as amended,* and will be referred to as the Bridge Bill for purposes of this opinion.

Conrail, which presently had two tracks at the crossing location, agreed, as part of the project, to remove one track, leaving only one track to pass through the crossing. The installation of a rubber-type crossing and the relocation of the switch to remove the second track was to be done at an estimated cost of $65,000. In addition, it was estimated that the installation cost of new flashing light signals would be approximately $75,000. The Conrail witness also testified that it would be recommended that any additional necessary railroad right-of-way be made available for the project.

Finally, a witness testifying for the County voiced no objection to the proposed construction of the at-grade crossing to replace the existing bridge. However, the County would not agree to bear any of the cost of the proposed crossing, or any future maintenance. The County did agree to pay $35,000 to the Borough from the grant for community development toward the demolition of the existing structure.

The Commission issued its order on November 28, 1984, wherein it directed the Borough to submit detailed construction plans, remove the bridge structure and construct the new approaches to the crossing. The order further required Conrail to construct the new at-grade crossing.

After the completion of the construction of the crossing, a hearing was held by the Commission on June 3, 1986, for the receipt of evidence concerning final allocation of costs and maintenance of the crossing. On March 23, 1987, the ALJ issued his Recommended Decision allocating costs and maintenance responsibilities among all of the parties. The ALJ allocated 80% of the costs to DOT, 12.5% to the Borough, 4.2% to the County, and 3.3% to Conrail. Exceptions were taken by the Borough. The Commission by order dated May 28, 1987, adopted the Recommended Decision of the ALJ and denied the Borough's Exceptions. This appeal followed.

The petitioner raises two issues for our review: first, whether the Commission erred as a matter of law and abused its discretion in adopting the ALJ's allocation of the costs of the bridge project between DOT, Conrail, the Borough, and the County; and second, whether Conrail should be estopped from receiving damages for property appropriated for the at-grade crossing.

Our scope of review is limited to a determination of whether the order of the Commission violates the Borough's constitutional rights, involves an error of law or is unsupported by substantial evidence. Section 704 of the Administrative Agency Law, 2 Pa. C. S. §704. *See also Erie Lackawanna Railway Company v. Pennsylvania Public Utility Commission,* 2 Pa. Commonwealth Ct. 396, 278 A.2d 188 (1971).

The Commission is vested with the power to allocate costs for the construction, relocation and alteration of rail-highway crossings in Section 2704(a) of the Public Utility Code, 66 Pa. C. S. §2704(a). In apportioning costs, the Commission is not limited to any fixed rule, but takes into consideration all relevant factors, the only requirement being that its order be just and reasonable. *Department of Transportation v. Pennsylvania Public Utility Commission,* 79 Pa. Commonwealth Ct. 266, 469 A.2d 1149 (1983). The Borough alleges that the ALJ's allocation, as adopted by the Commission, was so unreasonable as to constitute an error of law. We must disagree.

The Borough's argument is based upon two contentions. First, the Borough argues that the monies available for this bridge project under the Bridge Bill were used for the benefit of Conrail's proportionate share and not for the benefit of the intended beneficiary, the Borough. The thrust of the Borough's argument is that the Bridge Bill was enacted solely to provide relief to local municipalities forced to rehabilitate old

bridges within their bounds. Under the Borough's interpretation of the Bridge Bill, the local municipality would not incur any of the costs of bridge reconstruction. We decline to accept the Borough's interpretation of the Bridge Bill. The language of both the Bridge Bill and the 1986 amendment[2] thereto clearly indicates that the Bridge Bill was not enacted to free local municipalities from any financial obligation related to the reconstruction of rail-highway crossing. Illustrative of this point is Section 12.2 of the amendment to the Bridge Bill which provides:

> Section 12.2. Reimbursement Agreement.
>
> In the interest of the public health, safety and welfare, municipalities may begin and complete design, land acquisition and construction of the capital projects enumerated in section 3, subject to the approval of the Pennsylvania Department of Transportation as to structural adequacy, at their own initial risk and expense. To assure a municipality's entitlement to funds, *if any*, under this act for these purposes, the Commonwealth, through the Pennsylvania Department of Transportation, will enter into an agreement with a municipality to reimburse the municipality for costs previously incurred in the design, land acquisition and construction of capital projects enumerated in section 3 at such time as funds become available, if at all. (Emphasis added.)

The language of this Section indicates that the purpose of the Bridge Bill and its amendment was to provide a source of funding for bridge reconstruction and repair, not exclusively available to the local municipalities. Therefore, the ALJ, in his decision, and the Commis-

---

[2] Act of July 9, 1986, P.L. 597.

sion, which later adopted that decision, did not err in recognizing the Bridge Bill funding and allocating the remaining unfunded costs between the interested parties.

The Borough further contends that the allocation was unfair and unreasonable in consideration of the original allocation for bridge costs in 1928 and the benefits reaped by all of the parties concerned. All factors considered, we cannot conclude that the Commission erred in adopting the ALJ's recommended allocation of costs between the parties.

The ALJ concluded from the evidence that DOT, as agent for the Bridge Bill, was to be responsible for 80% of the actual construction costs of the total project. He went on to note that the County receives a direct benefit by having its residents travel through the crossing. Therefore, the ALJ concluded that the $35,000 paid by the County toward the cost of demolition of the structure was a just and fair amount to be borne by the County.

Furthermore, the ALJ concluded that the benefits derived by Conrail from the construction of an at-grade crossing were very minimal. The ALJ considered the fact that the Pennsylvania Railroad, as predecessor to Conrail, constructed and maintained a grade separation structure. Under the present project, calling for demolition of the structure, Conrail was relieved of any obligation in connection with maintenance of the structure. However, the ALJ noted that Conrail will be assigned maintenance of the at-grade crossing because of the automatic crossing flashing lights, the crossing gates and circuits. Accordingly, the ALJ felt it just and reasonable for Conrail to bear a portion of the unfunded share of the project costs, based primarily on the responsibility Conrail would have had to maintain the old structure.

Finally, the ALJ concluded that the Borough has benefitted from this project in that the old, dangerous

bridge had been replaced. In addition, the public would have open use of Fairview Avenue and the improvements which had been made to the local streets at each end of Fairview Avenue. Therefore, the ALJ concluded that the Borough should bear a portion of the unfunded costs.

It is clear that the Commission considered all relevant factors when it adopted the Recommended Decision of the ALJ. We cannot conclude that the allocation of 12.5% of the costs of reconstruction was an unjust or unreasonable proportion of costs to be borne by the Borough. In consideration of the benefits which the Borough will reap from this new crossing, the Commission was clearly within its bounds in ordering that the Borough bear a small portion of the costs.[3]

We shall now address the Borough's contention that Conrail must be estopped from receiving damages for property appropriated for the at-grade crossing. The Commission, by Order dated November 16, 1984, directed that the Borough pay right-of-way damages. By subsequent order dated January 24, 1985, the Commission appropriated Conrail's property for the at-grade crossing. The Borough points out that Conrail has never requested any reimbursement for the taking. It also contends that Conrail took the position at the hearing of June 7, 1984, that the recommendation would be made to management at Conrail to donate the right-of-way to

---

[3] The Borough places great weight on the fact that the Commission, in prior cases, has placed all responsibility on Conrail for bridge reconstruction. We do not find these cases controlling of the issue in this matter, as the Commission is only required to consider all factors and make a reasonable and just allocation of costs. The Borough, in this matter, is essentially requesting that it be absolved from any costs related to this new crossing. Considering the benefits derived by the Borough, we cannot conclude that the allocation adopted by the Commission is unjust or unreasonable.

the project. The Borough alleges that the order of the Commission which directs the Borough to pay further monies to Conrail for the appropriation of the right-of-way, is contrary to the agreement, either express or implied, between Conrail and the Borough.

We fail to see how the Borough can conclude that the mere statement at a hearing that a recommendation would be made to management to donate a right-of-way somehow constitutes an agreement between the parties that the land would be given to the project. No such express or implied agreement between Conrail or the Borough existed. Moreover, the Borough has appealed neither the November 16, 1984 nor the January 24, 1985 orders of the Commission. The Borough's request for a reversal of these two orders must be denied, having been waived by its failure to file a petition for review within thirty days of the entry of the Commission orders. *See* Pa. R.A.P. 1512.

We must conclude that the Commission committed no error of law because its order was just and reasonable and based upon substantial evidence of record. Accordingly, we affirm.

### ORDER

AND NOW, this 28th day of June, 1988, the Order of the Pennsylvania Public Utility Commission in the above-captioned matter is affirmed.