## APPENDIX A

CONSOLIDATED RAIL CORPORATION,
Petitioner,

v.

PENNSYLVANIA PUBLIC UTILITY
COMMISSION, Respondent.

Commonwealth Court of Pennsylvania.

Argued Sept. 15, 1995.
Decided Dec. 4, 1995.
Publication Ordered Feb. 2, 1996.

David C. Eaton, for Petitioner.

Susan T. Povilaitis, for Respondent.

Steven P. Miner, for Intervenor, Borough of Royalton.

Before SMITH and KELLEY, JJ., and RODGERS, Senior Judge.

SMITH, Judge.

Consolidated Rail Corporation (Conrail) petitions for review of an order of the Pennsylvania Public Utility Commission (PUC) directing rehabilitation of a bridge over railroad tracks and allocating costs. Conrail asserts that, when the National Railroad Passenger Corporation (Amtrak) owns property carrying its tracks beneath a highway but is exempt under a federal statute from the imposition of costs to maintain the crossing, Amtrak's share of costs should be ascertained by the PUC and then be allocated to governmental entities benefitting from the passenger rail service.

A small, one-lane bridge rebuilt in 1920 carries Burd Street in the Borough of Royalton (Royalton) over three tracks owned by Amtrak. Amtrak operates 109 trains per week on two of the tracks. Conrail has a perpetual easement to use a portion of Amtrak's right-of-way with one track, whose rails and ties it owns; it operates six trains per day on this track and a few by agreement on the other two. Conrail has agreed to pay Amtrak a pro rata share of any Amtrak expenditures for repair and maintenance. Neither Amtrak nor Conrail has a

stop in Royalton. Burd Street separates the two wards in Royalton; the bridge in question is the main and fastest route between them for emergency vehicles.

The bridge is in poor condition. Royalton filed a complaint concerning it with the PUC in 1979. In 1981 the PUC ordered Amtrak to inspect the bridge and submit a report and to perform emergency repairs and maintain the bridge pending further order. Amtrak has made no payments for maintenance since 1982; Conrail was not previously assigned any maintenance responsibilities. Dauphin County, in which Royalton is located, has spent no money on repair and maintenance, although it coordinated inspections in 1991 and 1993 and was reimbursed 80%. The Pennsylvania Department of Transportation (DOT) has not paid for repairs since 1981. The bridge is listed on the third phase of DOT's 12–year plan for replacement, which would cost a little over $1 million. In 1990 Royalton petitioned for enforcement of the PUC's 1981 order beyond the simple filing of the report.

In 1992, following consideration of the question at the direction of the PUC, an Administrative Law Judge (ALJ) issued a recommended decision concluding that, under *National R.R. Passenger Corp. v. Pennsylvania Public Utility Commission,* 848 F.2d 436 (3d Cir.1988), *cert. denied,* 488 U.S. 893, 109 S.Ct. 231, 102 L.Ed.2d 220 (1988) (*Amtrak I*), interpreting former 45 U.S.C. § 546b,[1] Amtrak could not be assessed any costs for repair or maintenance of the bridge after September 30, 1981; therefore the PUC's 1981 order could not be enforced against Amtrak. The PUC adopted that decision and directed that the docket remain open for receipt of further evidence and the issuance of a further recommended decision.

■ Following a hearing, the ALJ recommended rehabilitation of the bridge, at a cost of $287,000, over replacement at the present time. The ALJ directed that DOT be responsible for performing the work and allocated the costs 90 percent to DOT, 7.5 percent to Conrail and 2.5 percent to Royalton. On exceptions, the PUC modified the ALJ's order by making Royalton responsible for performing the work and by allocating the costs 80 percent to DOT, 10 percent to Conrail and 10 percent to Royalton. The PUC's order further clarified the ALJ's decision by holding that it made Conrail responsible for 25 percent of ongoing maintenance costs. Conrail has petitioned for review.[2]

■ The PUC has authority to allocate costs of maintenance of rail-highway crossings pursuant to Section 2704(a) of the Public Utility Code (Code), 66 Pa.C.S. § 2704(a). *D & H Corp. v. Pennsylvania Public Utility Commission,* 149 Pa.Cmwlth. 507, 613 A.2d 622 (1992), *appeal denied,* 534 Pa. 642, 626 A.2d 1160 (1993). In apportioning such costs, the PUC is not limited to any fixed rate but takes all relevant factors into consideration; the fundamental requirement is that the PUC's order be just and reasonable. *Id.*

The federal statutory exemption currently provides:

> Amtrak or a rail carrier subsidiary of Amtrak is exempt from a tax or fee imposed by a State, a political subdivision of a State, or a local taxing authority and levied on it after September 30, 1981. However, Amtrak is not exempt under this subsection from a tax or fee that it was required to pay as of September 10, 1982.

49 U.S.C. § 24301(*l*)(1). As Conrail notes, in *Amtrak I* the Third Circuit Court of Appeals examined the history of the creation and sustaining of Amtrak by Congress. In a report to Congress in 1980 the Secretary of Transportation concluded that state and local taxes on a primarily federal investment in

---

**1.** Section 546b was repealed by § 7(b) of the Act of July 5, 1994, Pub.L. 103–272, 108 Stat. 1379; it was reenacted with linguistic but not substantive change and recodified at 49 U.S.C. § 24301(*l*) by § 1(e) of the same Act, 108 Stat. 904. *See* H.R.Rep. No. 180, 103d Cong., 2d Sess. 1, 3, 5 (1993), *reprinted in* 1994 U.S.C.C.A.N. 818, 820, 822.

**2.** The scope of this Court's review of an order of the PUC is limited to determining whether the necessary findings of fact are supported by substantial evidence in the record and whether there has been an error of law or a constitutional violation. *Pocono Water Co. v. Pennsylvania Public Utility Commission,* 158 Pa.Cmwlth. 41, 630 A.2d 971 (1993).

Amtrak were inappropriate; the Senate Appropriations Committee, in a report in connection with the bill that became the original one-year exemption, "disapproved the process through which federal subsidies were used to provide tax windfalls to states and localities." *Amtrak I*, 848 F.2d at 438.

■ The court in *Amtrak I* examined the legislative history of former Section 546b and found an intent that assessments which otherwise would have fallen to Amtrak be borne by state and local governments as the cost of continued rail passenger service in or near their communities, on the rationale that when local jurisdictions are demanding that nationwide rail passenger service be maintained, it is reasonable to require those areas receiving the service to contribute to Amtrak's continued existence through tax relief. The Court of Appeals concluded: "That intention is clear—to impose a passenger rail 'user fee' on state and local governments. It would be manifestly inconsistent with that design to make Amtrak pay for related local improvements in the many instances where the states could, and would, impose them." *Id.* at 440. Conrail contends that both the legislative history and the cases interpreting former Section 546b show that Congress intended to impose Amtrak's tax exemption upon governmental entities, not upon a private company operating on Amtrak's lines pursuant to an easement.

Further, Conrail asserts that if no exemption applied Amtrak normally might have been expected to bear no more than 10 percent of the costs of rehabilitation, and Conrail would pay one-third of that amount under their contract. Conrail argues that it should be covered by Amtrak's exemption; however, even if it is not, Conrail believes that it should not be charged more than it would be otherwise because Amtrak is exempt. Although recognizing the PUC's broad power to allocate costs such as these, Conrail asserts that the PUC should not be

permitted to shift responsibility for these "user fees" for the benefit of continued passenger rail service from the state and local governments benefitting from such service onto Conrail.

In response, the PUC contends that the ALJ and the PUC followed the proper rule by considering all relevant factors, including Conrail's use of the lines beneath the bridge and its benefit from the separated crossing. As the ALJ stated:

The testimony shows that Conrail possesses an easement in Amtrak's right-of-way which was conveyed in 1985. Furthermore, Conrail owns the trackage (rails and ties) of one of the three tracks that pass beneath the bridge. Conrail's argument that it receives no benefit from the existence of the bridge is simply unpersuasive. Clearly, a railroad receives a significant benefit from a grade-separated crossing. *Pittsburgh and Lake Erie Railroad Company v. Pennsylvania Public Utility Commission*, 124 Pa.Cmwlth. 611, [615–616,] 556 A.2d 944, 946 (1989). Since Conrail possesses an easement in Amtrak's right-of-way, ownership of the trackage itself and a leasehold interest in the adjoining Amtrak tracks, it is quite reasonable to assign Conrail some of the cost of the project.

ALJ's Further Recommended Decision, August 8, 1994, p. 16.

■ The PUC argues that substantial evidence supports the ALJ's findings that Conrail benefits from the separated crossing. It contends that the Court's adopting Conrail's proposed cost allocation theory and method would require the Court to go outside its scope of review. Further, nothing in the federal statutory exemption prohibits the PUC from allocating rehabilitation cost among "concerned" parties within the meaning of Section 2702 of the Code, 66 Pa.C.S. § 2702, even if one of those parties is a railroad other than Amtrak.[3] In addition,

---

3. Section 2702(c) provides in part: "The commission may order the work of construction, relocation, alteration, protection, suspension or abolition of any crossing aforesaid to be performed in whole or in part by any public utility or municipal corporation concerned or by the

Commonwealth." The PUC has the authority to determine who are the parties "concerned." *County of Chester v. Pennsylvania Public Utility Commission*, 47 Pa.Cmwlth. 366, 408 A.2d 552 (1979) (interpreting identical language in the predecessor of Section 2702(c) of the Code, for-

the PUC notes that Conrail is a private corporation, but Amtrak is federally subsidized; therefore, the rationale referred to in *Amtrak I* of not diminishing federal subsidies through the burdens of local taxation does not apply.

DOT as intervenor addresses Conrail's contention that its share of the cost should not be increased because of Amtrak's exemption by noting the ALJ's cogent observation that the effect of the exemption is to require proportionately larger contributions from others. DOT notes also that the record is devoid of any indication that Amtrak would have been assigned a share of 10 percent of the costs of rehabilitation under the PUC's 1981 order. Intervenor Royalton adds the point that in *Amtrak I* the only rail lines under the bridge involved were those of Amtrak; hence, Amtrak's exemption required placing the burden on governmental entities.[4]

The Court agrees with the PUC that 49 U.S.C. § 24301(*l*), as interpreted in *Amtrak I*, does not apply to any obligations of Conrail in regard to the bridge involved here. Conrail has not pursued on appeal its claim that it receives no benefit from the existence of the bridge; hence the PUC's manifestly supported finding that it does benefit is now conclusive. Section 24301(*l*) by its own terms applies only to Amtrak. The rationales that governmental units in areas that receive the benefit of passenger rail service should contribute to maintaining such service through tax relief, and that direct federal subsidies for that service should not be siphoned off by state or local taxation, apply only to federally subsidized rail passenger service, which Conrail does not claim to provide. Nothing in Section 24301(*l*) or *Amtrak I* suggests that another party, who benefits from a separated crossing but does not provide rail passenger service and who is neither Amtrak nor a governmental unit, may not be required to contribute a fair share to the necessary maintenance of a crossing.

Conrail also contends that it should pay no more because of Amtrak's exemption than it would otherwise, namely its one-third share of the 10 percent that Amtrak "[n]ormally ... might have been expected to bear...." First, the Court finds no basis in the record for the 10 percent figure, apart from Conrail's assertion of it in its Reply Exceptions. Second, the Court agrees with the ALJ that the federal exemption of Amtrak from paying any rehabilitation costs necessarily means that others will be responsible for a proportionately higher share. Conrail's perception that it has simply been substituted for Amtrak as the party responsible for 10 percent is based solely on its completely speculative figure of 10 percent as Amtrak's likely share absent the exemption.

Finally, the Court rejects Conrail's contention raised for the first time in its reply brief that the PUC and this Court lack jurisdiction to assign costs to Conrail because this subject matter has been preempted by the federal statute. This amounts to little more than a recasting of Conrail's primary position. The PUC and this Court have duly recognized the federal preemption of the subject matter of state and local assessment of charges against Amtrak for repair or replacement of railroad crossings. Nothing in the statute, the legislative history or case interpretations indicates that the preemption was intended to extend farther. Accordingly, the order of the PUC is affirmed.

### ORDER

AND NOW, this 4th day of December, 1995, the order of the Pennsylvania Public Utility Commission is affirmed.

mer Section 409 of the Public Utility Law, Act of May 28, 1937, P.L. 1053, *as amended, formerly* 66 P.S. § 1179(c), *repealed by the Act of July 1, 1978, P.L. 598*).

**4.** The Court of Appeals noted that freight trains operated by Conrail and commuter trains operated by the Southeastern Pennsylvania Transporta-tion Authority also used tracks, paying Amtrak for that right. *Amtrak I*, 848 F.2d at 437 n. 1. *The PUC order in that case assigned the costs of* replacing a bridge approximately 20 percent to Amtrak and the remaining 80 percent to the township where the bridge was located, which amount would be reimbursed by the state.