**CITY OF PHILADELPHIA, Petitioner,**

v.

**PENNSYLVANIA PUBLIC UTILITY COMMISSION, Respondent.**

**CONSOLIDATED RAIL CORPORATION, Petitioner,**

v.

**PENNSYLVANIA PUBLIC UTILITY COMMISSION, Respondent.**

Commonwealth Court of Pennsylvania.

Argued April 16, 1996.
Decided May 24, 1996.

---

Gerald T. Clark, for Petitioner, City of Philadelphia.

David C. Eaton, for Petitioner, Consolidated Rail Corporation.

Susan T. Povilaitis, Assistant Counsel, for Respondent.

Lee C. Silverman, Assistant Counsel, for Intervenor, Department of Transportation.

Before SMITH and PELLEGRINI, JJ., and NARICK, Senior Judge.

PELLEGRINI, Judge.

The City of Philadelphia (City) and Consolidated Rail Corporation (Conrail) present cross-appeals of a decision of the Pennsylvania Public Utility Commission (PUC) directing the City to incur the costs of performing an inspection, preparing construction plans and reconstructing a bridge and directing Conrail, upon completion, to reimburse the City for 20 percent of the actual cost of the inspection, planning and repairs to the bridge. The bridge carries 41st Street, a City street in West Philadelphia, over railroad tracks used principally for passenger rail service.

In November of 1993, the City informed the PUC that it found the 41st Street Bridge to be in a deteriorating structural condition and had reduced its load limit from 20 tons to three tons. The 41st Street Bridge crosses six railroad lines, four are currently owned by the National Railroad Passenger Corporation (Amtrak) and the remaining two are owned by Conrail. Conrail's railroad tracks have not been used in recent years. Amtrak's tracks are used both by Amtrak and, on lease, by the Southeastern Pennsylvania Transportation Authority (SEPTA).[1]

All parties agreed that further investigation was needed, but none agreed to perform any of the work. The PUC initially ordered that plans be made to restore the bridge to its original load limit by Amtrak but at the cost of the City. Amtrak petitioned for reconsideration, asserting, among other things, that it is exempt from paying such costs, and hearings were scheduled before an administrative law judge (ALJ). While the case was pending before the PUC, the City closed the bridge to all motor vehicle traffic due to continuing deterioration.

The ALJ found that the bridge was built by the Pennsylvania Railroad in 1928. Pennsylvania Railroad signed an agreement with the City in 1927 requiring the railroad to maintain the bridge. Pennsylvania Railroad was succeeded by Penn Central Transportation Company which acknowledged responsibility for maintenance of the bridge under the 1927 agreement with the City. In 1976, Penn Central transferred the property and right-of-way for the tracks to Conrail. Conrail immediately transferred the property and right-of-way for some of the tracks to Amtrak. Corresponding to its ownership, Amtrak solely performed maintenance on the bridge while the City solely performed maintenance on the approach roadways to the bridge.

■ The ALJ found that the City should perform an in-depth inspection, prepare plans and perform repairs to the bridge. The ALJ recommended that, after the work was completed, Conrail reimburse the City for 20 percent of all actual costs of the reconstruction and thereafter maintain the bridge. The City, the ALJ found, should be responsible for maintaining the approaches to the bridge. Although Amtrak was not present at the hearing and presented no acceptable evidence, the ALJ held that the PUC has no authority to order Amtrak to repair and

---

1. SEPTA is not a party before us because the PUC concluded that it leases its tracks from Amtrak and has no ownership interest in the railroad tracks.

maintain the bridge, citing *National Railroad Passenger Corporation v. Pennsylvania Public Utility Commission*, 665 F.Supp. 402 (E.D.Pa.1987), *affirmed*, 848 F.2d 436 (3rd Cir.1988), *cert. denied*, 488 U.S. 893, 109 S.Ct. 231, 102 L.Ed.2d 220 (1988) (*Amtrak I*), wherein the Third Circuit held that the PUC could not impose costs of reconstructing a bridge crossing on Amtrak because Amtrak was statutorily exempt from all state taxes and fees. The PUC adopted the findings and recommended decision of the ALJ. The City then filed this appeal and Conrail filed a cross-appeal.[2] After its initial petition to the PUC, Amtrak has chosen not to participate before the PUC or this court.

### I.

■■■ Pursuant to Sections 2702(b) and 2704(a) of the Public Utility Code (Code), 66 Pa.C.S. §§ 2702(b) and 2704(a),[3] the Commission is vested with the authority to determine who shall bear the costs associated with the repair or maintenance of a railroad crossing and the facilities at or adjacent to such a crossing in order to protect the safety of the public.[4] In exercising this authority, the PUC is not limited to any fixed rate with respect to the allocation of costs, but instead, may take all relevant factors into consideration. *Department of Transportation v. Pennsylvania Public Utility Commission*, 79 Pa.Cmwlth. 266, 469 A.2d 1149 (1983). The allocation of costs between the parties is within the discretion of the PUC, but such allocation must be just and reasonable. *Borough of South Greensburg v. Pennsylvania Public Utility Commission*, 117 Pa.Cmwlth. 361, 544 A.2d 82 (1988). The decision must be based upon some sound legal or factual basis. *Port Authority of Allegheny County v. Pennsylvania Public Utility Commission*, 207 Pa. Superior Ct. 299, 217 A.2d 810 (1966).[5]

The City contends that the PUC erred in holding that it could not require Amtrak to be responsible for maintenance costs and in not enforcing the 1927 agreement against Amtrak and Conrail as successors of the railroad which assumed all maintenance costs in that agreement. The City also contends the PUC erred in holding that it had any responsibility for maintenance based on the 1927 agreement and based on the fact that

---

**2.** Our scope of review is limited to determining whether the PUC violated constitutional rights, committed an error of law, rendered a decision that is not supported by substantial evidence, or has violated its rules of practice. *Greene Township Board of Supervisors v. Pennsylvania Public Utility Commission*, 668 A.2d 615 (Pa.Cmwlth. 1995).

**3.** Section 2702(b) of the Code provides, in pertinent part:
> The [PUC] is hereby vested with exclusive power to appropriate property for any [rail-highway] crossing, ... and to determine and prescribe, by regulation or order, the points at which, and the manner in which, such crossing may be constructed, altered, relocated, suspended or abolished, and the manner and conditions in or under which such crossing shall be maintained, operated and protected to effectuate the prevention of accidents and the promotion of the safety of the public.

As to cost allocation, Section 2704(a) of the Code provides, in pertinent part:
> [T]he cost of construction, relocation, alteration, protection, or abolition of such crossing, and of facilities at or adjacent to such crossing which are used in any kind of public utility service, shall be borne and paid, as provided by this section, by the public utilities or municipal corporations concerned, or by the Commonwealth, in such proper proportions as the [PUC] may, after due notice and hearing, de-

termine, unless such proportions are mutually agreed upon and paid by the interested parties.

**4.** A railroad-highway crossing is the intersection of a highway with a railroad's right-of-way upon which railroad tracks lie and can be at, above or below the grade of the railroad tracks. *Southeastern Pennsylvania Transportation Authority v. Pennsylvania Public Utility Commission*, 140 Pa. Cmwlth. 270, 592 A.2d 797 800 n. 2 (1991), *petition for allowance of appeal denied*, 531 Pa. 642, 611 A.2d 714 (1992). A crossing can also include other public utilities, such as gas, water or electric facilities.

**5.** Recently, in *Greene Township Board of Supervisors*, 668 A.2d at 619, we restated the factors which have consistently been viewed as relevant to the PUC's allocation of costs:
> 1. The party that originally built the crossing.
> 2. The party that owned and maintained the crossing.
> 3. The relative benefit initially conferred on each party with the construction of the crossing.
> 4. Whether either party is responsible for the deterioration of the crossing that has led to the need for its repair, replacement or removal.
> 5. The relative benefit that each party will receive from the repair, replacement or removal of the crossing. (Citations omitted).

Amtrak and Conrail received the benefit of the bridge crossing over their tracks. The City contends that the allocation to Conrail, to pay 20 percent of the repair and none of the costs of the detour or approach roadways, is too low. Conrail contends that there should be no assessment against it because it receives no benefit from the bridge, since the tracks it owns under the bridge are inactive. It also contends the PUC cannot enforce the 1927 agreement against it, because its enabling statute prohibits successor liability.

## II.

The overriding question before us is whether the PUC erred in holding that it cannot order Amtrak to pay costs for construction or repair of a bridge over Amtrak facilities. The PUC's holding was based on the federal court decision in *Amtrak I*, that such an allocation of costs was a tax on Amtrak in violation of 45 U.S.C. § 546b,[6] which grants Amtrak an exemption from "a tax or fee imposed by a State". The City argues that this court's decision in *Southeastern Pennsylvania Transportation Authority v. Pennsylvania Public Utility Commission*, 140 Pa.Cmwlth. 270, 592 A.2d 797 (1991), *petition for allowance of appeal denied*, 531 Pa. 642, 611 A.2d 714 (1992) (*SEPTA I*) that the exemption for taxes and fees, in the same federal statute, is inapplicable to the PUC's cost allocation to SEPTA, allows the PUC to impose such costs on Amtrak. In resolving this question, we first address the prior cases addressing Amtrak's liability and the historical basis for the PUC's jurisdiction over the matter.

### A. *Prior Case Law*

In *Amtrak I*, the first case addressing the issue, the PUC ordered Amtrak to pay 20 percent of the replacement cost of a bridge located in Tredyffrin Township, with the remaining 80 percent paid by the township, subject to reimbursement from the state. Amtrak sought declaratory and injunctive relief in federal court. In determining whether the allocation of reconstruction and maintenance costs to Amtrak is prohibited by the exemption for "a tax or fee", the Third Circuit stated that the costs were similar to "special assessments". Holding that such "special assessments" amounted to taxes on Amtrak, as we noted in *SEPTA I*, the Third Circuit court gave special consideration to the statute's legislative history and purpose:

- The Senate Appropriations Committee reasoned that "such taxation serves to erode the revenue-to-cost ratios which impact on whether States and localities continue to receive the benefits of Amtrak service." S.Rep. No. 253, 97th Cong., 1st Sess. 103 (1981).

- A Senate Committee Report commented that "there are many parts of the country which would gladly pay an amount equal to local or State taxes owed by Amtrak in order to have the benefit of Amtrak service." S.Rep. No. 516, 97th Cong., 2d Sess. 170 (1982).

- Amtrak was created to maintain and improve rail passenger service with federal financial support and the payment of taxes would impinge on the ability to carry out that service.

---

**6.** Section 546b was repealed by § 7(b) of the Act of July 5, 1994, Pub.L. 103–272, 108 Stat. 1379; it was reenacted with linguistic but not substantive change and recodified at 49 U.S.C. § 24301(*l*) by § 1(e) of the same Act, 108 Stat. 904. *See* H.R.Rep. No. 180, 103d Cong., 2d Sess. 1, 3, 5 (1993). As now codified at 49 U.S.C. § 24301(*l*)(1), the federal statutory exemption provides:

> Amtrak or a rail carrier subsidiary of Amtrak is exempt from a tax or fee imposed by a State, a political subdivision of a State, or a local taxing authority and levied on it after September 1, 1981....

The subsequent provision provides jurisdiction in the federal district courts for actions brought by Amtrak to enforce the exemption, but does not preclude this court's jurisdiction over Amtrak. Because the relevant exemption has been referred to as Section 546b in numerous prior cases, for consistency, we will continue to use that reference.

The historical setting for Congress' creation of Amtrak was set forth in *National Railroad Passenger Corp. v. Atchison, Topeka & Santa Fe Railway*, 470 U.S. 451, 453–57, 105 S.Ct. 1441, 1445–47, 84 L.Ed.2d 432 (1985). Congress enacted the Rail Passenger Service Act in 1971 in an effort to revive the failing intercity passenger lines and established a private corporation known as Amtrak. *Amtrak I*, 848 F.2d at 438. Because Amtrak's financial standing was poor, despite federal subsidies, and it was spending a substantial amount on state and local taxes ($14 million in 1980), Congress enacted the tax exemption in 1982. Pub.L. 97–257, 96 Stat. 852 (September 10, 1982).

*Amtrak I*, 848 F.2d at 437–440. Affirming the District Court, the Third Circuit held the allocation of costs were taxes from which Amtrak was exempt because it would be inappropriate to undermine the goals of Amtrak through "the too stingy construction of the exemption". *Id.* at 437.

Thereafter, the PUC issued an order requiring the bridge to be maintained rather than replaced and ordered Amtrak to contribute to the cost of maintenance. Amtrak requested the federal courts to enforce their previous injunction against the PUC to prevent the new cost allocation. In a memorandum opinion, Judge Newcomer, for the District Court, held that the imposition of maintenance costs was enjoined by the order in *Amtrak I* and that the PUC's action violated that order. The District Court's order reiterated a permanent injunction against the PUC's imposition of any costs of maintenance for the bridge against Amtrak. *National Railroad Passenger Corporation v. Commonwealth of Pennsylvania and Township of Tredyffrin*, No. 86–5357, 1991 WL 998, filed January 2, 1991. Judge Newcomer also awarded Amtrak its costs and attorney's fees incurred not only in enforcing the injunction but also in contesting before the PUC the imposition of the maintenance costs. *National Railroad Passenger Corporation v. Commonwealth of Pennsylvania and Township of Tredyffrin*, No. 86–5357, 1991 WL 998, filed July 1, 1991.

The Second Circuit Court of Appeals, however, has more narrowly applied the exemption. In *National Railroad Passenger Corporation v. City of New York*, 882 F.2d 710 (2nd Cir.1989), *affirming*, 695 F.Supp. 1570 (S.D.N.Y.1988) (*Amtrak II*), the city had entered an agreement with Pennsylvania Railroad to allow it to use routes in the city for the payment of an annual "rental". As the successor of Pennsylvania Railroad, Amtrak argued that it was exempt from the payments. The District Court disagreed with Amtrak's assertion that it was exempt and the Second Circuit affirmed. Contrary to the Third Circuit, the Second Circuit held that the payments under the agreement were "rent", or payments for the use of City property, and were not taxes or fees from which Amtrak is exempt. *Id.* at 716. The Second

Circuit examined the legislative history of the exemption for "a tax or fee" finding that:

● A committee report stated that the legislation was intended to exempt Amtrak from paying "property taxes, income and franchise taxes, sales taxes, gross revenue taxes, fuel taxes, licenses and other fees, to the same extent as the United States is exempt from the payment of such taxes or other fees." H.R.Rep. No. 81, 97th Cong., 1st Sess. 19, 21 (1981).

● The committee report stated that "it is not the Committee's desire to exempt Amtrak from the payment of fees for services used, such as water and sewer, just as the United States is not exempt from the payment of such fees." *Id.*

● There is no evidence in the legislative history that Congress intended to exempt Amtrak from all payments to state and local governments, only from state and local taxes, whereas here, the payments are based on a consensual agreement between Amtrak's predecessors and the city for the use of real property.

*Amtrak II*, 882 F.2d at 714–15. As a result of this split between the circuits, Amtrak is required to contribute to the maintenance or reconstruction of crossings, including bridges, in New York, but not in Pennsylvania, Delaware or New Jersey.

In *SEPTA I*, this court addressed the issue of whether SEPTA, a state agency that as a "commuter authority" is entitled to the same exemption as Amtrak under 45 U.S.C. § 581(c)(5), was exempt from the PUC's allocation of maintenance costs for a bridge which it owns and which carries a roadway over its tracks. Because this court had "fundamental differences with the Third Circuit's analysis" in *Amtrak I* that a special assessment is a tax, we made a thorough analysis of the nature of a crossing. Such analysis was absent from the Third Circuit's opinion. *SEPTA I*, 592 A.2d at 803.

In discussing the nature of the allocation of maintenance costs, we analyzed how crossing maintenance would be accomplished if the PUC did not carry out its legislative function—by private agreements or special legislation between the entities crossing each other's right-of-way with resort to actions for

specific performance if one party does not fulfill its obligations. *Id.* 592 A.2d at 803–804. The PUC's authority to allocate those costs was simply recognized by the General Assembly as a more rational way to ensure the safety of the public by a timely allocation of responsibility and initiating investigations; it is nonetheless based on the same common law principle that responsibility lies with those who own and use the crossing. *Id.* 592 A.2d at 804. Because of the nature of the parties' relationship and because the PUC's involvement was legislated as a way to better maintain safety for the travelling public, the allocation of the costs of maintaining the bridge is like the rental fees paid in *Amtrak II,* and not a tax or fee of the kind for which Amtrak was intended to be exempt.[7]

Undeterred by this court's holding that it could be liable, SEPTA sought a more favorable result in the federal courts by bringing an action to prevent the enforcement of three PUC orders allocating part of the costs of maintaining three highway bridges, owned by SEPTA, to it. *Southeastern Pennsylvania Transportation Authority v. Pennsylvania Public Utility Commission,* 826 F.Supp. 1506 (E.D.Pa.1993) (*SEPTA II*)[8] and *Southeastern Pennsylvania Transportation Authority v. Pennsylvania Public Utility Commission,* 802 F.Supp. 1273 (E.D.Pa.1992). Ruling on the PUC's motion to dismiss, the District Court held that SEPTA, like Amtrak, is exempt because the allocation of maintenance responsibilities for the bridges is a tax or fee by the state. *Id.* at 1281. It reasoned that, because Congress intended to impose a passenger rail "user fee" on state and local governments, it would be inconsistent to require SEPTA to pay for "related

local improvements in the many instances where the states could, and would, impose them". *Id.* at 1280. The District Court also stated that ownership of the bridge and whether the payments are for replacement or repair are immaterial because forced payments for local improvements constitute a tax within the meaning of the federal exemption. *Id.* at 1281 n. 13.

Although footnoting this court's decision that SEPTA is not exempt from maintenance costs, unlike our in-depth analysis of the circuit courts' reasoning, the District Court did not address the reasoning of our decision stating "it is well understood that 'where a federal right is concerned we are not bound by the characterization given to a state tax by state courts or Legislatures, or relieved by it from the duty of considering the real nature of the tax and its effect upon the federal right asserted.'" *Id.* at 1279 n. 10 (quoting *United States v. Allegheny County,* 322 U.S. 174, 184, 64 S.Ct. 908, 914, 88 L.Ed. 1209 (1943)). Subsequently, granting summary judgment to SEPTA and enjoining the PUC from allocating any costs of maintenance or repair of the bridges to SEPTA, the District Court stated that it is bound to consider the Third Circuit's determination "a fortiorari, more correct than contrary rulings by state courts"[9] and refused to withhold its jurisdiction based on SEPTA's forum shopping. *SEPTA II,* 826 F.Supp. at 1516 n. 8.

After the federal courts' decisions relating to SEPTA's liability, the PUC and SEPTA entered into a consent decree wherein the PUC agreed to refrain from assessing upon SEPTA the cost of or responsibility for the construction, reconstruction, inspection,

---

7. The decision in *Consolidated Railroad Corporation v. Pennsylvania Public Utility Commission,* 671 A.2d 248 (Pa.Cmwlth.1995), is not contrary to either *SEPTA I* or our holding in this case. There, Conrail argued that it was allocated too much of the costs for the repair and maintenance of bridge crossing tracks used by both Amtrak and Conrail, because once the PUC found Amtrak exempt from paying those costs, the legislative intent of the exemption was that the governmental entities be allocated those costs, not a private company. Because only Conrail appealed, no issue was raised that the PUC erred in holding that Amtrak was exempt. We held first that the federal exemption does not apply, by its own terms, to exempt Conrail, and second, that

Conrail, who possessed an easement in the right-of-way, ownership of the tracks and a leasehold interest in Amtrak's tracks, benefited from the crossing and was required to contribute a fair share to the maintenance as determined by the PUC. *Id.* at 252.

8. *Affirmed per curiam,* 27 F.3d 558 (3rd Cir. 1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 318, 130 L.Ed.2d 279 (1994).

9. Although the District Court is *a fortiorari* bound by the Third Circuit's determination, the Third Circuit's decision is not *a fortiorari* "more correct".

maintenance or repair of any highway bridge, and to reopen any proceedings within its jurisdiction where it had assessed SEPTA any of those costs and to reassign the cost to parties other than SEPTA. *Southeastern Pennsylvania Transportation Authority v. Pennsylvania Public Utility Commission*, No. 95–CV–4500 (E.D. Pa. filed January 19, 1996).

 As a result of the federal cases, the extent of Amtrak's exemption under 45 U.S.C. § 546b, in relation to maintenance costs for a crossing, is muddled: the Second Circuit and the Pennsylvania courts consider such payments not to be a tax or fee but a continuing maintenance obligation, while the Third Circuit considers it a tax.[10] In an effort to convince the Third Circuit that our approach, and the Second Circuit's, is the better view (and absent convincing them, at least, prod them to address our analysis), we will again revisit the PUC's role in allocating costs of maintaining utility crossings, which is one of ensuring the public safety not being a tax collector.

## B. *Historical Basis of the PUC's Jurisdiction to Allocate Costs*

At common law, when a private corporation constructed a railroad which made a bridge necessary at the crossing of a high-way, imposed on the private corporation was the duty not only of constructing the bridge but also of maintaining the bridge to enable the public to safely use the highway. Elliott, The Law of Roads and Streets, § 41 (2d ed.1900). *See Smith v. Pennsylvania Railroad Company*, 201 Pa. 131, 50 A. 829 (1901). This common law duty was considered an imperative one and could be enforced by mandamus. Elliott, *supra* at § 41. If the railroad company refused to perform its duty to keep a crossing in repair, the municipality where the crossing was located could repair it and recover the cost of those repairs from the railroad company by bringing an action in court. *Id.* at § 785. *Pittsburgh, Virginia & Charleston Railway Company v. Commonwealth*, 101 Pa. 192 (1882).

During the same period, highways, roads and streets were placed under the control of the municipalities through which they ran and the state withdrew from actively building and from maintaining those highways, roads and streets. *Westmoreland Chemical & Color Company v. Public Service Commission*, 294 Pa. 451, 144 A. 407 (1928). Once the municipalities had control over the roads within their borders, the responsibility for maintenance was assigned in agreements between the municipalities and the railroad companies as part of the municipalities'

---

**10.** Absent a pronouncement by the United States Supreme Court, decisions of the inferior federal courts are not binding on state courts. *Rader v. Pennsylvania Turnpike Commission*, 407 Pa. 609, 182 A.2d 199 (1962); *Lilley v. Johns–Manville Corporation*, 408 Pa. Superior Ct. 83, 596 A.2d 203 (1991), *petition for allowance of appeal denied*, 530 Pa. 644, 607 A.2d 254 (1992). There is no hierarchical arrangement between state courts and federal courts that exercise jurisdiction within that state. Under the federal system, the states possess sovereignty concurrent with that of the federal government. *New York v. United States*, 505 U.S. 144, 163, 112 S.Ct. 2408, 2421–22, 120 L.Ed.2d 120 (1992). The Supreme Court stated in *Howlett v. Rose*, 496 U.S. 356, 372–73, 110 S.Ct. 2430, 2440–41, 110 L.Ed.2d 332 (1990):

Federal law is enforceable in state courts not because Congress has determined that federal courts would otherwise be burdened or that state courts might provide a more convenient forum—although both might well be true—but because the Constitution and laws passed pursuant to it are as much laws in the States as laws passed by the state legislature. The Supremacy Clause makes those laws "the supreme Law of the Land," and charges state courts with a coordinate responsibility to enforce that law according to their regular modes of procedure. "The laws of the United State are laws in the several States, and just as much binding on the citizens and court thereof as the State laws are.... The two together form one system of jurisprudence, which constitutes the law of the land for the State; and the courts of the two jurisdictions are not foreign to each other, nor to be treated by each other as such, but as courts of the same country, having jurisdiction partly different and partly concurrent."

(Quoting *Claflin v. Houseman*, 93 U.S. 130, 136–37, 23 L.Ed. 833 (1876)). Accordingly, state courts share responsibility for the application and enforcement of federal law. *Howlett*, 496 U.S. at 372–73, 110 S.Ct. at 2440–41.

Although having concurrent rather than subordinate jurisdiction to decide the issue of federal law before us, we would nonetheless normally find the Third Circuit decision of great probity in interpreting the federal statute. However, that does not hold true when there is a circuit court split and our own analysis reveals that the Third Circuit is clearly wrong.

agreement to the placement of the crossings. *SEPTA I*, 592 A.2d at 803.[11] If either party failed to fulfill its part of the agreement, the other party could seek to compel performance of maintenance responsibilities. *Id.* at 804. "This situation is analogous to a common driveway with shared maintenance responsibilities where if one party does not perform or agree to reconstruction, the other party can sue for specific performance." *Id.*

The greatest area of controversy related to highway-railroad crossings at the turn of the century was at-grade crossings. The legislature, concerned with public safety, encouraged the abolishment of grade crossings first by empowering the railroad companies themselves to do it with oversight by the courts. *Westmoreland Chemical & Color*, 294 Pa. at 463, 144 A. at 409.[12] The courts, when faced with determining whether a new at-grade crossing would be allowed due to "imperious necessity",[13] lamented their inability to determine how crossings should be made or how

to equitably apportion the expense among those interested. *Chester Traction Company v. Philadelphia, Wilmington & Baltimore Railroad Company*, 188 Pa. 105, 41 A. 449 (1898). In 1913, the legislature created the Public Service Commission [14] and conferred upon it jurisdiction over the abolishment, relocation or repair of grade crossings. The General Assembly recognized that to ensure the public safety, a more rational method of ensuring that obligations to keep crossings safe was needed. *SEPTA I*, 592 A.2d at 804. The legislation conformed with the common law duty on the railroad companies to ensure the public safety but added that the municipalities involved may be required to contribute to the cost of new crossings as a whole:

> That a railroad company may be compelled to contribute to the abandonment or abolishing of a grade crossing without invasion of its right under the Fourteenth Amendment to the Constitution of the United States is also clear. . . . The extent of this

---

**11.** Additionally, where one utility crossed another, special legislation, through the exercise of police powers, could approve the crossing and establish construction and maintenance responsibilities to ensure the safety and convenience of the public. Elliott, *supra* at § 778. *See Minersville Borough v. Schuylkill Electric Railway Company*, 205 Pa. 394, 54 A. 1050 (1903).

**12.** In *Perry County Railroad Extension Company v. Newport & Sherman's Val. Railroad Company*, 150 Pa. 193, 199, 24 A. 709 (1892), the Supreme Court stated:

> The time for grade crossings in this state has passed. They ought not to be permitted, except in case of imperious necessity. They admittedly involve great danger to life and property. In the earlier period of railroads this danger was overlooked, or, at least, disregarded. The desire of the people for this species of improvements tended to close their eyes to the dangers involved. The traffic then upon railroads was comparatively light, and trains ran at long intervals. The rapid development of the country, the enormous growth in wealth, population and business, has materially changed the relations of railroads to the public and to each other. The result is that we now see railroad companies and municipalities spending enormous sums in correcting the defects of earlier railroad construction, and especially in avoiding grade crossings.

**13.** The courts' jurisdiction over such questions was given by the Act of June 19, 1871, P.L. 1360, *formerly* 15 P.S. § 117, repealed by Section 2(a) of the Act of April 28, 1978, P.L. 202.

**14.** With the enactment of the Public Service Company Law in 1913, Act of July 26, 1913, P.L. 1374, *formerly*, 66 P.S. §§ 571–577, repealed by the Act of May 28, 1937, P.L. 1053, the State exerted its police power through regulatory controls over public utilities, giving the Public Service Commission modified but exclusive jurisdiction over the construction of rail-highway crossings and the abolishment of dangerous conditions. *Westmoreland Chemical & Color*, 294 Pa. at 457, 144 A. at 408. Section 12 of the Public Service Company Law stated that the expenses of the relocation, alteration or abolition of any crossing:

> shall be borne and paid, as hereinafter provided, by the public service company or companies or municipal corporations concerned, or by the Commonwealth, either severally or in such proper proportions as the Commission may, . . . determine.

However, if the parties came to an agreement about the payment for such changes and then defaulted on the agreement, the Commission was empowered to contract for the work to be done and then to recover the costs "as debts of like amount are now by law recoverable, from the public service company or companies" in the proportions determined by the Commission. Section 12 of the Act of July 26, 1913, P.L. 1374. Section 12 was replaced by Section 411 of the Public Utility Law of 1937, Act of May 28, 1937, P.L. 1053, *formerly*, 66 P.S. § 1181, repealed by the Act of July 1, 1978, P.L. 598.

contribution would be the cost of the structure in its entirety, which includes the approaches and damages to property injured by the change of grade. The State, through the commission, may lawfully require the expense to be paid either by the railroad company or the county, township or municipality where the crossing is situated, jointly or in several allotments as their interest or benefit may determine. *Westmoreland Chemical & Color,* 294 Pa. at 463–64, 144 A. at 409 (citations omitted). The cost of approaches and damage to the property of private persons aside, like under the common law, the legislature could have demanded the railroad companies to replace at-grade crossings at its own cost. However, recognizing a benefit to the municipalities affected, the legislature permitted an allocation of costs to those parties, as well as the railroad companies.

 Presently, the Public Utility Code establishes that the PUC [15] is required to ensure the public safety, not only by requiring maintenance on bridges, but also by, for example, emergency closings, investigating crossings and ordering the installation of lights or rails. 66 Pa.C.S. § 2702. However, none of these costs, including the imposition of maintenance costs here, are paid to the government or used to support general government obligations. As we stated in *SEPTA I,* the money from the PUC's imposition of maintenance costs:

> [I]s used to ensure that those who benefit from the crossing or who share that easement maintain it in a safe manner for the travelling public. The task which the PUC performs is not imposing a new responsibility on parties who benefit from the crossing, but in essence, only requires the parties to perform maintenance responsibilities that they would have [performed] even if the PUC did not impose them, because at common law or under legisla-

tion authorizing the construction of those facilities, the parties would still have those obligations. Akin to adjoining property owners responsibility for the maintenance of a "common driveway," the parties benefiting from a crossing always have the responsibility to maintain it, irrespective of how that maintenance is accomplished.

*SEPTA I,* 592 A.2d at 804.

### C. Tax or Fee

 In determining whether the PUC erred in refusing to allocate costs to Amtrak for maintaining the 41st Street Bridge, we believe it is incumbent upon this court to consider the nature of the allocation permitted by the Public Utility Code. The PUC argued that it cannot comply with both the state case law, *SEPTA I,* and the federal case law, including the federal court's imposition of costs and the consent decree.[16] While somewhat sympathetic, we believe the decision in *SEPTA I* is clearly controlling and we are compelled to hold that the PUC erred in not considering Amtrak when allocating the costs of reconstructing the 41st Street Bridge.

 The allocation of the costs of maintaining a highway-roadway crossing by the PUC is simply a determination of how those who benefit from the crossing will incur costs they would have had at common law and is not a tax or fee. The classic tax is "imposed by a legislature upon many, or all citizens ... raises money, contributed to a general fund, and spent for the benefit of the entire community". *San Juan Cellular Telephone Co. v. Public Service Commission of Puerto Rico,* 967 F.2d 683 (1st Cir.1992). A tax is an "enforced contribution to provide for the support of government". *United States v. LaFranca,* 282 U.S. 568, 51 S.Ct. 278, 75 L.Ed. 551 (1931). Where a charge is

---

15. In enacting the Code and creating the PUC, the legislature sought to establish a statewide standardization of all facets of the operation of public utilities under the governance of the PUC. *City of Philadelphia v. Philadelphia Electric Company,* 504 Pa. 312, 473 A.2d 997 (1984). In doing so, it did not effect a change in the PUC's power to allocate costs. *Id.* at 322, 473 A.2d at 1002.

16. The PUC entry into a consent decree is problematic. The municipalities or private entities could make valid arguments that neither the federal courts or this court has considered. By entering into the consent decree agreeing not to allocate any costs to SEPTA, the PUC has prejudged those arguments and deprives those parties of their due process right to a full and fair hearing. Of course, we are not bound by the consent decree.

imposed by a state or municipality not in its capacity as a sovereign but rather under a voluntary, contractual relationship, it has been held not to be a tax. *United States v. City of Columbia, Missouri,* 914 F.2d 151, 156 (8th Cir.1990). A "fee" is paid to a public agency for bestowing a benefit which is not shared by the general members of the community and is paid by choice. *City of Vanceburg, Kentucky v. Federal Energy Regulatory Commission,* 571 F.2d 630, 644 (D.C.Cir.1977), *cert. denied,* 439 U.S. 818, 99 S.Ct. 79, 58 L.Ed.2d 108 (1978). The Supreme Court distinguished taxes and fees in *National Cable Television Association v. United States,* 415 U.S. 336, 340, 94 S.Ct. 1146, 1149, 39 L.Ed.2d 370 (1974):

> Taxation is a legislative function, and [a legislature] ... may act arbitrarily and disregard benefits bestowed by [a g]overnment on a taxpayer and go solely on ability to pay.... A fee, however, is incident to a voluntary act, e.g., a request that a public agency permit an applicant to practice law or medicine or construct a house or run a broadcast station.

The PUC's allocation of costs does not meet the definition of a tax: it is not a legislative function; it does not disregard benefits to the railroad; it is not a revenue-raising method imposed on a class of similar-

ly situated parties; and, it is not intended for general public benefit. Nor is it a fee charged for a specific benefit by a public agency.[17] Instead, the allocation was intended to be a timely, fair method of ensuring the safety of the public by those responsible for the crossing. Illustrating most vividly that it is not a tax or fee, the PUC can order the Commonwealth and local governments to pay private bodies for reconstruction or maintenance of crossings; whoever heard of a tax or fee that governments pay to private entities?

Without the PUC's intervention providing a reliable, orderly process, the public would have to rely on the railroad companies' voluntary fulfillment of its common law duty to maintain the bridges necessitated by their railroad tracks, with the only enforcement through the courts. These are the same costs incurred at common law, and the PUC's allocation based on intrinsic benefit does not make it a tax or fee. "The PUC's imposition of maintenance costs on the parties who benefit from the crossing in no way meets the test of what is to be considered a tax as set forth by the Supreme Court in *National Cable* and by the Second Circuit [in *Amtrak II* ], where it was found that a tax is where a payment is imposed, regardless of the benefits received." *SEPTA I,* 592 A.2d at 804.[18]

---

17. We believe that the legislative history restricts the term "fee" to payments that are like taxes. As discussed in *Amtrak II,* 882 F.2d at 714–15, the committee report stated that the legislation was intended to exempt Amtrak from paying "property taxes, income and franchise taxes, sales taxes, gross revenue taxes, fuel taxes, licenses and other fees," and that "it is not the Committee's desire to exempt Amtrak from the payment of fees for services used, such as water and sewer, just as the United States is not exempt from the payment of such fees." H.R.Rep. No. 81, 97th Cong., 1st Sess. 19, 21 (1981). Under the principle of *ejusdem generis,* the general term "other fees" must be interpreted to be limited by the specific types of taxes that precedes it to include only those payments of the same general kind or class as those specifically mentioned. *See* Black's Law Dictionary 464 (5th ed.1979). Moreover, the committee report stated that Amtrak should be exempt only "to the same extent as the United States is exempt from the payment of such taxes or other fees"; therefore, it should not be exempt from all payments to state and local governments, such as special assessments, only from state and local taxes. *See Amtrak II.*

18. In this case, Amtrak clearly owns the bridge, which was constructed and owned by Pennsylvania Railroad pursuant to the 1927 agreement, (R.R. 247a–248a), and transferred through deeds to Amtrak. (R.R. 190a–227a). Contrary to the District Court's assertion in *SEPTA II,* 826 F.Supp. at 1526, ownership of the bridge is not a "distinction without a difference". The District Court reaches this conclusion due to the absence of discussion of ownership in *Amtrak I,* wherein it is never indicated that Amtrak owned the bridge at issue, and its assertion that the PUC does not stress ownership in allocating costs because SEPTA could be allocated costs from bridges it does not own. The District Court ignores that the PUC is required to determine the interested parties that benefit from a crossing, resulting in a spreading of costs among those served by the crossing, but that ownership is clearly one of the factors considered to determine benefit, as recognized in the District Court's *Amtrak I* opinion, 665 F.Supp. at 403 n. 3.

Even if the PUC's allocation of costs is considered a "special assessment,"[19] as it was by the Third Circuit in *Amtrak I*, it is not a tax or fee from which Amtrak would be exempt because in Pennsylvania, such "special assessments" are the burden or benefits one bears or receives incidental to one's ownership of land, not a tax or fee to support the public welfare. *SEPTA I*, 592 A.2d at 803 n. 12; *Evans v. West Norriton Township Municipal Authority*, 370 Pa. 150, 155–56, 87 A.2d 474, 477 (1952); *Harrisburg v. Cemetery Association*, 293 Pa. 390, 394, 143 A. 111, 112 (1928); *see also Illinois Central Railroad Company v. City of Decatur*, 147 U.S. 190, 13 S.Ct. 293, 37 L.Ed. 132 (1893).[20]

Because the costs of repairing and maintaining the 41st Street Bridge are not a "tax" or "fee" from which Amtrak would be exempt, we vacate the PUC order and remand for it to make a new allocation of costs considering all parties, including Amtrak.[21] We retain jurisdiction.

### ORDER

AND NOW, this 24th day of May, 1996, the order of the Pennsylvania Public Utility Commission, dated March 31, 1995, No. I–00930028, is vacated, and the case is remanded to the Pennsylvania Public Utility Commission to apportion costs for the planning, repair and maintenance of the bridge between the present parties and the National Railroad Passenger Corporation, in accordance with the foregoing opinion. We will retain jurisdiction until this is accomplished.

---

19. Under Pennsylvania law, special assessments for linear improvements are made on the basis of who receives the benefits. *City of Philadelphia v. Philadelphia Transportation Company*, 345 Pa. 244, 26 A.2d 909 (1942). An assessment cannot be imposed on property not, in fact, receiving a benefit. *Riehl v. Millcreek Township Sewer Auth.*, 64 Pa.Commonwealth Ct. 513, 441 A.2d 466 (1982). *SEPTA I*, 592 A.2d at 803 n. 12.

20. The difference between special assessments and taxes has been well settled in Pennsylvania:

It is true that general taxation and these local assessments have their basis in the taxing power, but there the similarity ends. Payment of the former results in no return to the treasury; while in nearly every instance, all that is expended for the latter, and, not infrequently, much more, comes back when the property is sold. The former had no basis in contract and is limited only by the necessities of the government; the latter is quasi-contractual and is expressly limited to the benefits accruing to the property affected. These distinctions ... "have been recognized and stated by the courts of almost every state in the Union."

*Philadelphia v. United States Housing Corporation*, 280 Pa. 417, 422, 124 A. 669, 670–71 (1924) (quoting *Illinois Central Railroad Co.*).

21. Because it is necessary to remand for a new allocation of costs including Amtrak, we need not address the City's and Conrail's remaining contentions.