IN THE SUPREME COURT OF PENNSYLVANIA
MIDDLE DISTRICT

**TODD, C.J., DONOHUE, DOUGHERTY, WECHT, MUNDY, BROBSON, McCAFFERY, JJ.**

| | | |
|---|---|---|
| THE BOROUGH OF WEST CHESTER, | : | No. 9 MAP 2023 |
| | : | |
| Appellant | : | Appeal from the Commonwealth |
| | : | Court decision dated January 4, |
| | : | 2023 at No. 260 MD 2018. |
| | : | |
| v. | : | |
| | : | ARGUED:  September 11, 2024 |
| | : | |
| PENNSYLVANIA STATE SYSTEM OF | : | |
| HIGHER EDUCATION AND WEST | : | |
| CHESTER UNIVERSITY OF | : | |
| PENNSYLVANIA OF THE STATE SYSTEM | : | |
| OF HIGHER EDUCATION, | : | |
| | : | |
| Appellees | : | |

**OPINION**

**JUSTICE BROBSON**                    **DECIDED:  April 30, 2026**

In this dispute, we are asked to consider whether a charge levied by a local municipality for the purpose of managing stormwater runoff constitutes a local tax or a fee for service.  The Borough of West Chester (Borough)[1] appeals from an order of the Commonwealth Court, which granted the application for summary relief filed by the Pennsylvania State System of Higher Education (PASSHE)[2] and the University (jointly,

---

[1] The Borough is a home rule municipality organized and existing under the Home Rule Charter and Optional Plans Law, 53 Pa. C.S. §§ 2901-3171.

[2] PASSHE is "a body corporate and politic constituting a public corporation and government instrumentality."  Section 2002-A(a) of the Public School Code of 1929, Act of March 10, 1949, P.L. 30, *as amended*, added by the Act of November 12, 1982, P.L. 660, 24 P.S. § 20-2002-A(a).  PASSHE is comprised of fourteen public universities, one of which is West Chester University of PASSHE (University).

Appellees) and denied the application for summary relief filed by the Borough. The Commonwealth Court, sitting *en banc*, unanimously concluded that the Borough's charge for stormwater management services constitutes a local tax from which Appellees are immune as a matter of law. After careful review, we affirm.

## I. BACKGROUND

### A. Stormwater Management Generally

"For hundreds of millions of years, rain fell and nobody cared, mainly because there were no people." William G. Wilson, Stormwater 5 (2016). Over time, our populations have grown, civilizations have developed, and the rain has continued to fall. Only now, the rain falls onto sprawling cityscapes, major roadways, and other highly compacted materials. Unable to infiltrate these surfaces, the rain accumulates into large volumes and "run[s] off these surfaces in one big rush, flushing streams of organisms and material" and raising flood risks. *Id.* at xvi. As a result, even light rainfall can be devastating to local populations and ecosystems.

In recognition of this threat, federal and state legislatures have enacted various laws to encourage or require stormwater management. "Congress passed the Clean Water Act [(CWA)] in 1972 to 'restore and maintain the chemical, physical, and biological integrity of the Nation's waters.'" *Decker v. Nw. Env't Def. Ctr.*, 568 U.S. 597, 602 (2013) (quoting 33 U.S.C. § 1251(a)). The CWA established the National Pollution Discharge Elimination System (NPDES), which, among other things, authorizes the Environmental Protection Agency (EPA) to issue permits for the discharge of stormwater runoff into waterways. The EPA delegated the NPDES permitting authority to the Pennsylvania Department of Environmental Protection (PADEP). Subsequently, the General Assembly enacted the Storm Water Management Act (SWMA)[3] to "[e]ncourage local administration

---

[3] Act of October 4, 1978, P.L. 864, *as amended,* 32 P.S. §§ 680.1 to .17

and management of storm[]water." Section 3(3) of the SWMA, 32 P.S. § 680.3(3). In the present appeal, we consider the Borough's efforts to comply with these initiatives through its adoption of the Stream Protection Fee Ordinance (Ordinance), which is now set forth in the Code of the Borough of West Chester at Chapter 94A, W.Chester, Pa., Code §§ 94A-1 to -13 (adopted 2016).

By way of background, the Borough owns and operates a small municipal separate storm sewer system, otherwise known as an MS4.[4] The MS4, however, is only part of the Borough's "stormwater management system" (Borough System). As defined by Section 94A-5 of the Ordinance, the Borough System also includes:

> The system of collection and conveyance, including underground pipes, conduits, mains, inlets, culverts, catch basins, gutters, ditches, manholes, outfalls, dams, flood control structures, natural areas, structural and non-structural stormwater best management practices, channels, detention ponds, public streets, curbs, drains and all devices, appliances, appurtenances and facilities appurtenant thereto used for collecting, conducting, pumping, conveying, detaining, discharging and/or treating stormwater.

In June 2016, the Borough Council adopted Ordinance No. 5-2016, which imposed the "stream protection fee" (Stormwater Charge) upon the owners of all developed properties that it deemed benefited by the Borough System. Section 94A-6(A.) of the Ordinance. Section 94A-5 of the Ordinance defines the term "developed" as "[p]roperty where manmade changes have been made which add impervious surfaces to the property[.]" Section 94A-5 further defines the term "impervious surface" as "[a] surface that has been compacted or covered with a layer of material so that it prevents or is resistant to infiltration of water" and some other "highly compacted" or partially "porous"

---

[4] *See* 40 C.F.R. § 122.26(b)(16), (17) (defining "small municipal separate storm sewer system" and "small MS4").

surfaces. The amount of the Stormwater Charge reflects the amount of impervious surface on the developed property. *See* Section 94A-6(B.) of the Ordinance.

Section 94A-6(A.) of the Ordinance sets forth the following explanation for the imposition of the Stormwater Charge:

> For the use of, benefit by and the services rendered by the [Borough System], including its operation, maintenance, repair, replacement and improvement of said system and all other expenses . . . .

All sums collected from the payment of the Stormwater Charge are deposited into the "West Chester Borough Stormwater Management Fund" (Stormwater Fund), to be used for certain enumerated purposes:

> (1) Implementation and management of a program to manage stormwater within the Borough[;]
>
> (2) Constructing, operating, and maintaining the [Borough System;]
>
> (3) Debt service for financing stormwater capital projects[; and]
>
> (4) Payment for other project costs and performance of other functions or duties authorized by law in conjunction with the maintenance, operation, repair, construction, design, planning and management of stormwater facilities, programs and operations.

Section 94A-9(B.)(1)-(4) of the Ordinance.

In the event a landowner seeks to lower the amount of the Stormwater Charge, Section 94A-10(A.) of the Ordinance authorizes

> [t]he Borough [to] provide a system of credits against [the Stormwater Charge] for properties on which stormwater facility construction or maintenance substantially mitigates the peak discharge or runoff pollution flowing from such properties or substantially decreases the Borough's cost of maintaining the [Borough System].

The West Chester Borough Stream Protection Fee Program Appeal Policies and Procedures Manual (Appeals Manual)[5] further explains that a property owner can seek a

---

[5] The Borough updated its Appeals Manual during the pendency of this case. Our discussion considers only the iteration of the manual in effect at the time of briefing.

reduction of its assessed Stormwater Charge if the property owner can demonstrate that a "portion of the impervious surface area . . . has less or no impact on the [Borough System] and drains outside of the Borough[;] . . . [a]ny property which drains completely outside of the Borough . . . is not responsible for the [Stormwater Charge]." (Reproduced Record (R.R.) at 1917a-18a.)  Section 94A-11 of the Ordinance provides the appeals procedure.

## B.  Relevant Facts and Procedural History

A portion of the University's campus, referred to as North Campus, is comprised of multiple properties owned by PASSHE and/or the University and sits within the Borough's jurisdictional limits.  It is undisputed that at least some of the stormwater flowing from North Campus "either enters and flows through [the Borough] System or flows directly into a nearby watercourse." *Borough of W. Chester v. Pa. State Sys. of Higher Educ.*, 291 A.3d 455, 459 (Pa. Cmwlth. 2023) (citing Pet. for Rev. at 12, ¶ 53).  For these reasons, the Borough maintains that North Campus is developed and Appellees are benefiting from the Borough System, such that Appellees are subject to the Stormwater Charge.  *Id.* (citing Pet. for Rev. at 17, ¶¶ 76-77).  Accordingly, the Borough sent Appellees invoices for the Stormwater Charge in 2017, 2018, and 2019.  *Id.* (citing Pet. for Rev. at 19-21, ¶¶ 92-102).  Appellees, however, refused to pay the invoices because they believed the Stormwater Charge constituted a tax from which they are immune.

The Borough filed a petition for review with the Commonwealth Court against Appellees in which the Borough sought a declaratory judgment establishing that the Stormwater Charge is not a tax but, rather, a fee for service that Appellees must pay. Appellees filed a preliminary objection, demurring to the Borough's petition for review on

the basis that the Stormwater Charge is a tax from which they are immune.[6] *Id.* at 459 (citing Appellees' P.O. at 4-5, ¶¶ 15-25). In the alternative, if the charge was determined to be a fee, Appellees argued that the amount charged "is not reasonably proportional to the value of any product or service provided to" Appellees by the Borough, thereby effectively rendering the fee a tax. *Id.* (citing Appellees' P.O. at 6-7, ¶ 26).

The Commonwealth Court overruled Appellees' preliminary objection upon concluding that

> questions remain[ed], *inter alia*, as to: whether the [Borough System] provide[d] a discrete benefit to [Appellees], as opposed to generally aiding the environment and the public at large; whether the value of the [Borough] System to [Appellees] [was] reasonably proportional to the amount of the Stormwater Charge; and, apart from general operation, maintenance and repair of the [Borough System], how exactly . . . the Borough utilize[d] the funds generated by the Stormwater Charge.

*Id.* at 459-60 (some alterations in original) (quoting *Borough of W. Chester v. Pa. State Sys. of Higher Educ.* (Pa. Cmwlth., No. 260 M.D. 2018, filed July 15, 2019), slip op. at 11). The parties proceeded to further pleadings and discovery, after which the parties filed cross-applications for summary relief.

In their application for summary relief, Appellees reasserted their argument that "the Stormwater Charge constitutes a tax because the projects it funds are designed to return a 'general benefit' and promote 'the welfare of all.'" *Id.* at 461 (quoting Appellees' App. for Sum. Relief at 16, ¶ 52). For example, Appellees averred that all property owners and citizens in the Borough share the general benefits provided by "decreased flooding,

---

[6] Appellees included arguments characterizing the Stormwater Charge as either a general tax or a special assessment, as explained *infra*. *Borough of W. Chester*, 291 A.3d at 459 (citing Appellees' P.O. at 6, ¶ 24). In either event, Appellees explained that they would be immune from paying the Stormwater Charge. *See Sw. Del. Cnty. Mun. Auth. v. Aston Twp.*, 198 A.2d 867, 870 (Pa. 1964) ("[S]tatutes imposing assessments for local improvements are enacted in the exercise of the taxing power of the Legislature. They, therefore, . . . do not apply or relate to property held or used for public purposes by the state."). The Borough does not dispute Appellees' tax-immune status.

minimized erosion to public waterways, and cleaner water." *Id.* (citing Appellees' Br. in Support of App. for Sum. Relief at 27). Appellees also noted that, prior to the enactment of the Ordinance, the Borough System was funded through the Borough's general fund. *Id.* at 461-62 (citing Appellees' Br. in Support of App. for Sum. Relief at 41). In addition, Appellees cited the measures taken by Appellees to manage their stormwater runoff, including their own MS4 permit and stormwater system. By contrast, Appellees contended that much of the Borough's Pollution Reduction Plan, which is funded by the Stormwater Charge, would not benefit Appellees' properties. Finally, Appellees maintained their alternative argument that, assuming the Stormwater Charge is a fee, "it is not proportional to the cost of maintaining the [Borough] System." *Id.* at 461 (citing Appellees' App. for Sum. Relief at 17, ¶ 55). Thus, according to Appellees, the fee would, in effect, constitute a tax. *See Supervisors of Manheim Twp., Lancaster Cnty. v. Workman*, 38 A.2d 273, 276 (Pa. 1944) (holding that fees "must be reasonably proportional to the value of the product or service received" or else charge "is, in legal effect, undoubtedly a tax").

The Borough filed its own application for summary relief. The crux of the Borough's argument was that "specific and general benefits . . . are not mutually exclusive." *Borough of W. Chester*, 291 A.3d at 462 (citing Borough's Answer to Appellees' App. for Sum. Relief at 17-18, ¶ 54). The Borough acknowledged Appellees' MS4 permit and agreed that at least one aspect of its Pollution Reduction Plan is located outside of Appellees' properties. Nonetheless, the Borough maintained that the Stormwater Charge constitutes a fee because it is imposed only on developed properties, the revenue is deposited only into the Stormwater Fund, and the amount imposed may be reduced through mitigation efforts. *Id.* (citing Borough's Br. in Support of App. for Sum. Relief at 13-14). The Borough also argued that the Stormwater Charge is reasonably proportional to the benefit afforded

to property owners. In support, the Borough annualized the projected costs that Appellees would incur if they were "required to provide for disposal of their own stormwater" without reliance on the Borough System and compared it to the lower annual amount of the Stormwater Charge. *Id.* (citing Borough's Br. in Support of App. for Sum. Relief at 2, 12, 20, 33).

### C. Commonwealth Court Opinion

The Commonwealth Court began by setting forth the well-settled principle that, "[w]here the parties have filed cross-motions for summary relief, the [c]ourt must determine whether it is clear from the undisputed facts that one of the parties has established a clear right to the relief requested." *Borough of W. Chester*, 291 A.3d at 462 (quoting *Iseley v. Beard*, 841 A.2d 168, 169 n.1 (Pa. Cmwlth. 2004)). The Commonwealth Court identified that "[t]he present dispute turns on whether the Borough's Stormwater Charge constitutes a tax or a fee for service." *Id.* In defining these terms, the Commonwealth Court relied upon its prior case law, as well as case law from this Court and several federal courts. Of these cases, the Commonwealth Court found the reasoning provided in *DeKalb County, Georgia v. United States*, 108 Fed. Cl. 681 (Fed. Cl. 2013) (*DeKalb*), to be most persuasive. *Id.* at 465. Therein, the United States Court of Federal Claims (Federal Claims Court) held that a stormwater charge imposed by DeKalb County, Georgia constituted a tax because the benefits it provided "are enjoyed by the general public." *DeKalb*, 108 Fed. Cl. at 701. In so holding, the Federal Claims Court emphasized that "the burden imposed on the system by the runoff from the property, and the benefits conferred upon that property by the system are not the same thing." *Id.* at 703.

Upon reviewing the undisputed facts of record, the Commonwealth Court concluded that the Borough "fail[ed] to point to any evidence that [Appellees] receive

discrete benefits through payment of the Stormwater Charge." *Borough of W. Chester*, 291 A.3d at 464. Quoting *DeKalb*, the Commonwealth Court reiterated that, even assuming benefits conferred and burdens imposed were interchangeable, "the amount of the charge does not depend upon the burden actually imposed on the system by a particular property." *Id.* at 465 (quoting *DeKalb*, 108 Fed. Cl. at 703). In fact, the Commonwealth Court explained, the Borough "concede[d] that there is no means of measuring the amount of stormwater runoff that flows from North Campus into the [Borough] System" and, accordingly, "no direct measure of [Appellees'] purported use of the [Borough] System exists." *Id.*

In addition to this discussion of benefits, the Commonwealth Court considered whether the Stormwater Charge is imposed "under a voluntary, contractual relationship." *Id.* at 463 (quoting *City of Phila. v. Pa. Pub. Util. Comm'n*, 676 A.2d 1298, 1308 (Pa. Cmwlth. 1996)). The Commonwealth Court began by acknowledging the "appeals process through which owners of developed properties may apply for credits against Stormwater Charge assessments." *Id.* at 466. Ultimately, however, the Commonwealth Court summarily concluded that the Borough "fail[ed] to establish that it enters into 'voluntary, contractual relationship[s]' with property owners subject to [the] Stormwater [C]harge." *Id.* (second alteration in original) (quoting *City of Phila.*, 676 A.2d at 1308). For these reasons, the Commonwealth Court concluded that the Stormwater Charge did not constitute a fee. The Commonwealth Court further determined that "the Stormwater Charge does not constitute a special assessment," which can only be employed for "subsidizing a particular project of limited duration, such as constructing culverts and pipes" because the Stormwater Charge "subsidizes an ongoing series of evolving tasks and projects." *Id.* (citing *Sw. Del. Cnty. Mun. Auth.*, 198 A.2d at 870; *Supervisors of Manheim Twp.*, 38 A.2d at 275; and Sections 94A-6(A.), (B.) of the Ordinance).

By process of elimination, and because the work funded by the Stormwater Charge "yields a common benefit shared by residents of the Borough generally," the Commonwealth Court concluded that "the Stormwater Charge constitutes a general tax" from which Appellees are immune. *Id.* at 466-67. Accordingly, the Commonwealth Court granted summary relief in favor of Appellees.

## II. DISCUSSION

The Borough asks this Court to consider, *inter alia*, whether the Stormwater Charge constitutes a local tax or a fee for service.[7] As explained, the Commonwealth Court concluded that the Stormwater Charge constitutes a general tax, rather than a fee

---

[7] The Borough also asks this Court to consider whether the Commonwealth Court improperly allocated the burden of proof onto the Borough. This issue, while necessary to our disposition, requires little discussion. The Borough contends that Appellees, as the parties challenging the characterization of the Stormwater Charge, bore the burden of proving that the Stormwater Charge was a tax, rather than a fee. (Borough's Br. at 20 (citing *Rizzo v. City of Phila.*, 668 A.2d 236, 237 (Pa. Cmwlth. 1995)).) The Borough argues that the Commonwealth Court misallocated this burden and "incorrectly held that the Borough was required to prove that the [Stormwater Charge] is not a tax." (Borough's Reply Br. at 6 n.4 (emphasis omitted).) Conversely, Appellees argue that the Borough does "shoulder[] the burden of proof" because it was the party that filed the initial suit. (Appellees' Br. at 25.) The Borough contests this assertion, arguing, instead, that Appellees were "the [parties that] . . . challenged the proper characterization of the [Stormwater Charge]" by refusing to pay. (Borough's Reply Br. at 6.)

We agree with Appellees that the Commonwealth Court did not err in the allocation of the burden of proof. Before the Commonwealth Court, both sides took the position that there were no genuine issues of material fact and that they were entitled to judgment as a matter of law with respect to whether the Stormwater Charge was a tax (as argued by Appellees) or a fee for service (as argued by the Borough). As described above, the Commonwealth Court recognized the proper standard for ruling on cross-applications for summary relief. *See Borough of W. Chester*, 291 A.3d at 462; *see also Pa. Env't Def. Found. v. Commonwealth*, 279 A.3d 1194, 1202 (Pa. 2022) (providing standard). In applying that standard, the Commonwealth Court considered the dispositive question of law in this matter and ruled in favor of Appellees and against the Borough. In other words, the Commonwealth Court held that Appellees met their burden to prove that they were entitled to summary relief and that the Borough failed to meet its burden to prove the same. For the reasons provided herein, we agree with the Commonwealth Court and, consistent therewith, find no error in the burden of proof it applied.

for service.  In reviewing the Commonwealth Court's decision on cross-applications for summary relief, "we may grant relief only if no material questions of fact exist and the right to relief is clear." *Pa. Env't Def. Found.*, 279 A.3d at 1202 (citation omitted).  "[T]his Court also considers the record favorably to the non-moving party and resolves all doubts as to the existence of a genuine issue of material fact against the moving party."  *Hosp. & Healthsystem Ass'n of Pa. v. Commonwealth*, 77 A.3d 587, 602 (Pa. 2013).

### A.  Borough's Arguments[8]

The Borough argues that Appellees did not meet the standard for the grant of summary relief because genuine issues of material fact remain relative to:  (1) whether Appellees realize specific benefits from the discharge of their stormwater runoff to the Borough System; (2) whether Appellees' connection to the Borough System is voluntary; and (3) whether the amount of the Stormwater Charge is proportional to those specific benefits afforded by the service.

Regarding specific benefits, the Borough reiterates its position that Appellees' "claim is predicated upon the incorrect belief that the existence of generalized environmental benefits necessarily precludes the existence of specific benefits." (Borough's Br. at 25; *see also id.* at 30-34.)  The Borough maintains that Appellees

---

[8] The following entities have filed *amicus curiae* briefs in support of the Borough: (1) Radnor Township; (2) Lower Swatara Township and the Lower Swatara Township Municipal Authority; (3) the Pittsburgh Water and Sewer Authority; (4) the Township of Hampton, the Township of North Fayette, and the Coraopolis Water and Sewer Authority; (5) Chesapeake Bay Foundation, Inc.; (6) Citizens for Pennsylvania's Future; and (7) the Pennsylvania Municipal Authorities Association, the Pennsylvania State Association of Boroughs, the Pennsylvania State Association of Township Supervisors, the Pennsylvania State Association of Township Commissioners, the Pennsylvania Municipal League, Capital Region Water, the Wyoming Valley Sanity Authority, the Borough of Chambersburg, the East Hanover Township Municipal Authority, the City of Philadelphia, the City of Lancaster, the City of Lock Haven, the City of Franklin, Susquehanna Township, Mt. Lebanon Township, Ferguson Township, the Borough of State College, and Ebensburg Borough.

receive a specific benefit from their use of the Borough System because such system "relieves" Appellees of their obligation to manage their stormwater runoff.[9] (*Id.* at 40.) As explained above, it is undisputed that at least some stormwater that falls onto or near the North Campus flows through the Borough System or into a nearby watercourse. Without the use of the Borough System, the Borough estimates that Appellees would incur considerable costs to manage their stormwater runoff, both in terms of money and land use.[10] Furthermore, the Borough notes that Appellees' MS4 was designed with the understanding that Appellees could utilize aspects of the Borough System or watercourses. (*Id.* at 27-28.) As a result, the Borough argues that Appellees have received the benefit of freedom to use their properties for purposes other than stormwater management. (*See id.* at 40-41.) For these reasons, the Borough argues that Appellees enjoy a specific benefit from their connection to the Borough System.

As to voluntariness, the Borough argues that Appellees "make[] the affirmative voluntary choice to subject [themselves] to the" Stormwater Charge "[b]y choosing to hold, maintain, and improve" their developed parcels. (*Id.* at 43.) The Borough rejects Appellees' contention "that the costs associated with non-use of the Borough System are

---

[9] The Borough argues that any suggestion that Appellees could allow their stormwater runoff to go unmanaged is "both contrary to law and astounding." (Borough's Br. at 36.) Indeed, the Borough points out that Pennsylvania courts have long recognized the liability of landowners for the effects of unmanaged runoff. Furthermore, the Borough notes that Appellees are obligated to comply with the requirements of the SWMA, which requires owners of developed land to implement certain measures "consistent with the provisions of the applicable watershed storm[]water plan." (*Id.* at 38-39 (citing Section 13 of SWMA, 32 P.S. § 680.13).)

[10] The Borough estimates that Appellees would need to devote a minimum of 6.76 acres of land for infiltration facilities. (Borough's Br. at 41 (citing R.R. 1789a).) The Borough also presented an expert report, which suggested that the costs for independent management of Appellees' stormwater runoff would cost as much as $4.2 million. (*Id.* at 45 (citing R.R. 2040a).) Annualized, the Borough states that this figure would amount to $178,500 per year. (*Id.* at 49 (citing R.R. 2041a).) Comparatively, the Borough claims that it charged Appellees only $132,088.68 per year for utilizing the Borough System. (*Id.* (citing R.R. 303a-317a, 1743a).)

so prohibitive that any voluntariness is illusory." (*Id.* at 45; *see also id.* at 46 (quoting *City of Lewiston v. Gladu*, 40 A.3d 964, 970 (Me. 2012) ("The fact that the costs of avoiding the [charge] are quite high does not make the [charge] involuntary.")).) The Borough also highlights Appellees' ongoing maintenance of legacy structures, as well as their construction of new structures. Based upon the undisputed fact of this continued development, the Borough argues that it has established the voluntary nature of Appellees' use of the Borough System and, therefore, its assent to paying the Stormwater Charge. Additionally, the Borough emphasizes the appeal process and credits available under the Ordinance as evidence of the voluntariness of connection to the Borough System. *See* Section 94A-10 of the Ordinance. The Borough argues that the availability of this process, and the University's failure to avail themselves thereof, establishes the voluntary nature of the Stormwater Charge.

Finally, for the purposes of proportionality, the Borough argues that the high costs Appellees would otherwise incur without the Borough System are proof of the reasonableness of the Stormwater Charge. *See supra* n.9. Beyond that measure of benefit, however, the Borough challenges the Commonwealth Court's conclusion that "the impervious surface area of a property does not correlate to the level of benefit accorded the owner of that property." (Borough's Br. at 50 (quoting *Borough of W. Chester*, 291 A.3d at 464).) The Borough argues that the relationship between stormwater runoff and the amount of impervious surface is "axiomatic and well[ ]recognized" and "the Borough is unaware of any measure for calculating a stormwater management fee [that] does not at least include the amount of impervious cover at a property." (*Id.* at 52-53.) Alternatively, the Borough argues that Appellees failed to provide any evidence that the Stormwater Charge is not proportional to the benefit Appellees receive. Consequently,

the Borough concludes that the Commonwealth Court erred by granting summary relief in favor of Appellees.

In sum, the Borough argues that the Commonwealth Court erred by granting summary relief to Appellees because the record, when viewed in the light most favorable to the Borough, fails to establish that the Stormwater Charge is a tax. Rather, the Borough believes that the record demonstrates beyond peradventure that Appellees receive a benefit for which they voluntarily agreed to pay the reasonable, proportional fee calculated by the Ordinance. In the alternative, the Borough argues that genuine issues of material fact remain relative to the benefit derived from connection to the Borough System, the voluntariness of such connection, and the proportionality of the Stormwater Charge so as to preclude a grant of summary relief.

### B. Appellees' Arguments[11]

By contrast, Appellees argue that the dispositive question in this case is whether the Borough's stormwater management service provides a discrete benefit to the payors of the Stormwater Charge. Appellees contend that discrete benefits exist where the property owners receive an individual, specific benefit from the service performed and the property owners sought out the service from the position of a consumer in a marketplace. (*See* Appellees' Br. at 34.) Conversely, Appellees assert that a benefit is not discrete where it provides the same general, environmental benefits to the community or where the service is not one a property owner would voluntarily seek out. (*Id.*)

---

[11] The following entities have filed *amicus curiae* briefs in support of affirming the Commonwealth Court's decision: (1) Consolidated Scrap Resources, Inc., and Dura Bond Pipe LLC (CSR & Dura-Bond); (2) the Pennsylvania Aggregates and Concrete Association and the Pennsylvania Chamber of Business and Industry; (3) the Lehigh-Northampton Airport Authority; and (4) the Susquehanna Area Regional Airport Authority.

As applied here, Appellees maintain that the purpose of the Stormwater Charge is not to provide a specific, individual service to those that pay the charge. Rather, Appellees insist that the Borough provides stormwater management services to promote "the public health, safety, and general welfare" of all Borough residents. (*Id.* at 35 (quoting Section 94A-2(D.) of the Ordinance).) Appellees acknowledge that some property owners will benefit more than others based upon the type and location of their property, but Appellees insist that this does not transform general benefits into specific benefits for the purposes of characterizing a charge. By way of example, Appellees note that a new road may provide a greater benefit to abutting property owners than distant citizens. Nonetheless, according to Appellees the road provides a general, communal benefit, such that maintenance of that road must be funded through taxes. (*Id.* at 36 (citing *Supervisors of Manheim Twp.*, 38 A.2d at 276).) To further support this point, Appellees note that, for nearly 100 years, the Borough funded the construction and maintenance of its stormwater conveyance system through taxes. (*Id.* at 45.)

Appellees also dispute the relevance and scope of the Borough's expert report relative to the costs that Appellees would incur to manage their stormwater without reliance on the Borough System. (*Id.* at 39-41); *see supra* n.9. Appellees maintain that the report "merely describe[s] projected future expenses [Appellees] might have to bear," rather than providing proof of a present, discrete benefit or the Borough's costs in maintaining the existing stormwater infrastructure. (Appellees' Br. at 41 (emphasis omitted).) Consequently, Appellees argue that the Borough has failed to establish the existence of a discrete benefit afforded to Appellees through the expert report. For these reasons, Appellees maintain that the Stormwater Charge is a general tax from which they are immune and, accordingly, they are entitled to summary relief.

Appellees provide two alternative arguments. First, Appellees briefly argue that the Ordinance defines a Stormwater Charge as a special assessment from which Appellees are also immune. (*Id.* at 42-43 (quoting Section 94A-5 of the Ordinance (defining Stormwater Charge as "[a]n assessment")).) Second, Appellees argue that, even if the Stormwater Charge is a fee for service, it is not reasonably proportional to the service provided and, therefore, constitutes a tax. (*See id.* at 43.) Presuming that the use of the Borough System is the purported service, Appellees argue that the Borough did not analyze or consider the actual expected cost of maintaining the portion of the Borough System that Appellees utilize. In addition, Appellees emphasize that the Stormwater Fund finances other projects, many of which will occur far from North Campus. Appellees contend that these projects are unrelated to the purported service provided to them and, therefore, the Stormwater Charge is unreasonable to the extent that it requires payment by Appellees to contribute to these projects. Appellees further posit that, even if all landowners in the Borough constructed their own stormwater management systems, the Borough would still need to fund projects, such as tree planting, street sweeping, and curb extensions to address environmental concerns. (*Id.* at 45.) Thus, Appellees conclude that it would be unreasonable to rely on the benefits afforded by those projects to justify compelled contribution by way of the Stormwater Charge. For these reasons, Appellees ask this Court to affirm the Commonwealth Court's order.

### C. Analysis

### i. Charges Levied by Municipalities Generally

As framed by the parties, the issue presented in this matter is a question of benefits. Specifically, the parties argue that whether a charge constitutes a fee can be determined by whether the benefit provided is discrete or general, whether the amount of

the charge is reasonably proportional to that benefit, and whether the recipient has voluntarily accepted the exchange. Viewed in its broadest terms, a similar test has existed in Pennsylvania for over 150 years. The focus on the discrete nature of the benefit as a determinative characteristic of a fee, however, is of distinct, federal origin.[12] In Pennsylvania, the concept of a charge imposed against the recipient of a "specific" or "individual" benefit began not with a discussion of fees, but of taxes.

Traditionally, "[a] tax is an impost, levied by authority of the government upon its citizens or subjects for the support of the state. It is not founded upon contract or agreement. It operates *in invitum*." *Borough of McKeesport v. Fidler*, 23 A. 799, 800 (Pa. 1892). Taxes are "not for the supply of individuals or private corporations, however benevolent they may be." *Phila. Ass'n for Relief of Disabled Firemen v. Wood*, 39 Pa. 73, 82 (1861). Rather, taxes are intended "to furnish the measure of every man's duty in support of the public burdens." *Id.* In other words, "[t]he classic 'tax' is imposed by a legislature upon many, or all, citizens. It raises money, contributed to a general fund, and spent for the benefit of the entire community." *San Juan Cellular Tel. Co. v. Pub.*

---

[12] In 1974, the Supreme Court of the United States opined:

> Taxation is a legislative function, and [a legislature] . . . may act arbitrarily and disregard benefits bestowed by [a g]overnment on a taxpayer and go solely on ability to pay. . . . A fee, however, is incident to a voluntary act, *e.g.*, a request that a public agency permit an applicant to practice law or medicine or construct a house or run a broadcast station. The public agency performing those services normally may exact a fee for a grant which, presumably, bestows a benefit on the applicant, not shared by other members of society.

*Nat'l Cable Television Ass'n v. United States*, 415 U.S. 336, 340 (1974). Notably, the Supreme Court made these statements in relation to license fees, rather than fees for service. The parties do not argue that the Stormwater Charge constitutes a license fee or any other "regulatory fee" contemplated by federal courts. *See, e.g., Norfolk S. Ry. Co. v. City of Roanoke*, 916 F.3d 315, 322 (4th Cir. 2019) (discussing regulatory fees).

*Serv. Comm'n of Puerto Rico*, 967 F.2d 683, 685 (1st Cir. 1992) (citing, *inter alia*, *Nat'l Cable Television Ass'n*, 415 U.S. at 340-41).

"The practice of municipal taxation by counties, townships, cities and boroughs for local objects, had its origin in necessity and convenience." *In re Washington Ave.*, 69 Pa. 352, 358 (1871). As populations grew, local governments set out to establish "roads, bridges, culverts, sewers, pavements, school[]houses, and like local improvements." *Id.* Against this backdrop, "a new phase of taxation was presented," which "authorize[d] the assessment of property specially benefited by a local improvement of a public nature, for the purpose of defraying the expense thereof." *Olive Cemetery Co. v. City of Phila.*, 93 Pa. 129, 132 (1880). This "special mode of taxation," often referred to as a special assessment, was distinguished from general taxation by its "counterbalance of benefits, whereby those benefited more pay more, and those benefitted less pay less." *In re Washington Ave.*, 69 Pa. at 360. In recognizing the constitutionality of special assessments, this Court emphasized that this "special and individual taxation [is] sustainable only on the basis of special and individual benefit, and the limit of the benefit is the limit of the taxing power." *In re Park Ave. Sewer*, 32 A. 574, 575 (Pa. 1895).

Where the benefit justifying a municipally imposed charge "is only the same general and public advantage which is enjoyed by all citizens," and no special benefit is received "further than the general improvement and healthfulness of the neighborhood, which is common to the whole public," a special assessment cannot be levied. *Id.* at 575-76; *see also Hammett v. City of Phila.*, 65 Pa. 146, 157 (1869) (holding special assessments "cannot be so imposed when the improvement is either expressed[] or appears to be for general public benefit"). Along these same lines, the Court clarified that a special assessment is constitutional only as it relates to "an initial construction or

installation of a permanent improvement and not to its continuing maintenance or operation." *Supervisors of Manheim Twp.*, 38 A.2d at 275. Accordingly, "an assessment for special benefits may be imposed only once as to any given improvement."[13] *Id.*

It was within the line of cases establishing special assessments that this Court considered an alternate theory under which a charge levied by a municipality "can be justified if not imposed generally upon the same class of subjects within" its jurisdiction. *Id.* at 276. "[N]amely, as a reasonable charge for a product furnished, or additional service rendered, to particular persons or groups of persons within the [municipality]," *i.e.*, a fee for service. *Id.* The Court identified these charges as stemming from services rendered by the municipality in its quasiprivate capacity. While acting in this capacity, the municipality "stands upon the same footing as would any individual or body of persons upon whom the like special franchises had been conferred." *Jolly v. Monaca Borough*, 65 A. 809, 810 (Pa. 1907) (quoting *Appeal of Brumm*, 12 A. 855 (Pa. 1888) (per curiam affirm) (synopsis)). Accordingly, "[t]he obligation to pay for [the service] rests either on express or implied contract on the part of the consumer to make compensation for [service] which he has applied for and received." *Id.* at 811 (citation omitted).

### ii. Fee Framework

Based upon these foundational principles, the Court has developed a framework to distinguish a fee for service from other charges levied under a municipality's taxing authority. The framework for distinguishing a fee for service from a local tax is best understood as a two-step test. First, the court must determine whether the municipality is performing the service in a quasiprivate or public capacity. *See generally Jolly*, 65 A. at 810-11. In making this determination, this Court has considered the purpose

---

[13] Appellees argue in the alternative that the Stormwater Charge constitutes a special assessment. As we hold on alternative grounds that the Stormwater Charge constitutes a tax from which Appellees are immune, we do not address this argument.

underlying the municipality's participation in the service and the relationship between the municipality and the recipients of the service. *Id.* Where the municipality is acting out of duty, for the public benefit, and in the absence of a contractual relationship, the municipality is acting in its public capacity. *Id.* By contrast, where the municipality is providing a discretionary service for private emolument, and within the scope of a contractual relationship, the municipality is acting in its quasiprivate capacity. *Id.*

If the court concludes that the municipality is acting in its public capacity, then the associated charge is a tax and the inquiry ends. If the court concludes that the municipality is acting in its quasiprivate capacity, then the court must proceed to the second step, under which the court must determine whether the associated charge is measured by the service rendered. *See generally Supervisors of Manheim Twp.*, 38 A.2d at 276. If the charge is reasonably proportional to the extent of use or the value of the service rendered, then the charge is a fee. *Id.* If, however, there is no necessary or likely connection between the amount of the charge and the services rendered, then the charge is, in legal effect, a tax. *Id.*

This Court has applied this framework to charges levied by municipalities for over a century, and we see no reason to depart from it now.[14,15] We, nevertheless, use this

---

[14] As the current dispute of Pennsylvania law can be resolved through our existing framework, we do not rely upon the federal case law presented by the parties or discussed by the Commonwealth Court.

[15] In his concurring and dissenting opinion, Justice McCaffery suggests that we are "apply[ing] a different test" than the parties requested and the Commonwealth Court contemplated below. (Concurring and Dissenting Op. at 3 n.1 (McCaffery, J.).) This is not so. The framework discussed herein is the same one this Court utilized in *Supervisors of Manheim Township*, as relied upon by the parties and the Commonwealth Court below. In *Supervisors of Manheim Township*, however, the capacity that the municipality was operating under had been previously established. *See Supervisors of Manheim Twp.*, 38 A.2d at 275 ("The furnishing of light by a municipality is a function performed by it in its proprietary or quasiprivate capacity."); *see also Bailey v. City of Phila.*, 39 A. 494, 495 (Pa. 1898) ("[I]t is beyond question, on settled legal principles, that in [a municipality's] (continued…)

opportunity to provide further guidance on what a court should consider when determining whether a municipality provides a service in a quasiprivate or public capacity.

*a. Purpose Underlying Municipal Participation*

As explained above, a court must first consider the purpose underlying the municipality's participation in the service—*i.e.*, whether the municipality is acting out of a duty to the public and for the public good. In that regard, this Court has explained:

> In separating the two powers [conferred to a municipality], public and private, regard must be had to the object of the Legislature in conferring them. If granted for public purposes, exclusively, they belong to the corporate body in its public, political, or municipal character. But, if the grant was for purposes of private advantage and emolument, although the public may derive a common benefit therefrom[,] the corporation quoad hoc is to be regarded as a private company.

*Jolly*, 65 A. at 810 (quoting *Appeal of Brumm*, 12 A. at 855). Where this distinction is unclear, there are several indicia that may illuminate the nature of the power under which the municipality is providing the service.

Traditionally, a municipality's participation in a private franchise is discretionary or delegable. *Bailey*, 39 A. at 496 (discussing authority to perform private services as "merely a power conferred on the city as a corporation" that "may be exercised or not, at the city's option"). Consequently, even where a municipality initially chooses to participate, "there is no compulsion upon the [municipality] to continue . . . [participating]

---

performance of [supplying its citizens with light in the streets and public places] the [municipality] acts under authority merely, and not under municipal obligation.") Accordingly, there was no need for this Court to reiterate the parameters it used to reach this conclusion. By contrast, the current matter presents a question of first impression. It is, therefore, necessary to look beyond *Supervisors of Manheim Township* to apply the test presented therein. Furthermore, to the extent that the parties or the Commonwealth Court fail to identify case law from this Court on the issue presented, this Court should not compound the error by ignoring its own precedent. It is evident from the parties' framing of this issue that we lack a touchstone recitation of the framework as this Court has applied it. Thus, this section merely seeks to provide the bench and bar with a clearer understanding through a consolidation of our precedent.

at all, or to do it through its own officers, if in its legislative judgment it is no longer expedient to do so." *Id.* The discretionary nature of these services is often evident in the existence of a competitive private market. *Am. Aniline Prods., Inc. v. City of Lock Haven*, 135 A. 726, 727 (Pa. 1927) (explaining that private services are those which are "generally engaged in by individuals or private corporations"). Similarly, any existing regulatory laws surrounding the providers of a service "include[] all such bodies, municipal or otherwise." *Shirk v. City of Lancaster*, 169 A. 557, 561 (Pa. 1933); *see also id.* at 562 ("Should the supplying of water be determined to be a governmental function, inevitably there would follow endless confusion in the administration of the basic principles underlying the same business [by a private corporation].").

The scope of private franchises is broad, including, but not limited to, the supply and distribution of a commodity, ash collection, garbage removal, and sanitary sewer services. *Supervisors of Manheim Twp.*, 38 A.2d at 276. The purpose behind a municipality's participation in these services is equally diverse, and, in many circumstances, the municipality provides the service for both "the emolument and advantage of the [municipality] *and* for the public good." *Jolly*, 65 A. at 811 (emphasis added) (citation omitted). Ultimately, however, the authority afforded to municipalities that allows them to engage in these private services is "not conferred primarily or chiefly from considerations connected with the government, . . . but for the private advantage, comfort, and convenience of the compact community which is incorporated."[16] *Shirk*, 169 A. at 560.

By contrast, a public service in this context "is a strictly municipal function" that "cannot be abandoned." *Bailey*, 39 A. at 496. These services are, by nature, "coupled

---

[16] For example, where a municipality engages in the supply or distribution of a commodity, the "fundamentals of municipal ownership . . . are common convenience, efficiency, quality, and low cost of the commodity to the consumer." *Shirk*, 169 A. at 561.

with a municipal duty, [and] such duty [can]not be escaped by lease or other form of delegation." *Id.* Unlike a private service funded by fees, a public service provided for through taxation "only secures to the citizen that general benefit which results from protection to his person and property[] and the promotion of those various schemes which have for their object the welfare of all."[17] *In re Broad St. in Sewickley Borough*, 30 A. 1007, 1008 (Pa. 1895) (quoting *Ill. Cent. R. Co. v. City of Decatur*, 147 U.S. 190, 198 (1893)). In other words, public services are "a part of the ordinary duties of the municipality [and] for the general good." *Hammett*, 65 Pa. at 156. This Court has held that the paving of highways, *Shirk*, 169 A. at 564, "[r]epairing streets[,] . . . cleaning, watching and lighting" are all public services.[18] *Hammett*, 65 Pa. at 156.

### b. Nature of the Service Relationship

A court must then consider the relationship between the municipality and the recipients of the service. As in all other private enterprises, "the relation established" between the municipality and the individuals receiving a private service "is purely one of contract." *Jolly*, 65 A. at 810. "No one is compelled to receive or use [the service] and, when any one does so with knowledge of the rates charged, he by implication agrees to pay those rates." *Id.* at 811. In this way, "[t]he obligation to pay for the [service] rests

---

[17] This is not to say, however, that no taxpayer can receive a unique benefit from a public service. This Court has recognized that municipal endeavors typically require that "some discriminations and some preferences . . . be made against one portion of the community for the apparent sole benefit of another." *Shirk*, 169 A. at 564. The fact that things "cannot always be worked out equally" is simply "within the necessary theory of government." *Id.*

[18] Further consideration of these examples illustrates the error in considering only the discrete or general nature of a benefit to distinguish between taxes and fees, rather than the impetus behind the government's participation in the service. Insofar as a police response to one's call requesting aid constitutes a benefit discrete to the caller, that benefit is, nonetheless, inextricably tied to the function of government and furthers the government's interest in lowering crime. This latter, general benefit is clearly the impetus behind the service, regardless of the discrete benefit that will almost certainly result.

either on express or implied contract on the part of the consumer to make compensation for [the service,] which he has applied for and received, on the terms and conditions made public." *Id.* (citation omitted). Taxes, however, are "imposed *in invitum*," and no implied or explicit contractual relationship is necessary. *In re Petition of City of Phila.*, 16 A.2d 32, 35 (Pa. 1940). Rather, each taxpayer's obligation to pay is "created only by the [municipality's] exercise of its general taxing power." *Id.*

### iii. Application

In its decision below, the Commonwealth Court relied upon several cases that applied this fee framework. *See, e.g., Borough of W. Chester*, 291 A.3d at 463 (relying on *Supervisors of Manheim Twp.*, *supra*; *In re Petition of City of Phila.*, *supra*; and *In re City of Phila.*, 21 A.2d 876, 879 (Pa. 1941)). The Commonwealth Court concluded that the Stormwater Charge constitutes a tax because the Borough provides stormwater management services for the purpose of attaining "benefits that are enjoyed by the general public" and that the Borough's performance of the stormwater services is not based on "voluntary, contractual relationship[s]."[19] *Id.* at 465-66 (alteration in original) (quoting *DeKalb*, 108 Fed. Cl. at 701; and *City of Phila.*, 676 A.2d at 1308). We agree and, therefore, conclude that the Borough provides stormwater management in the Borough's public capacity.

The Borough's argument that the Stormwater Charge is a fee for service is built on the premise that the Ordinance is driven by an intent to relieve individual owners of developed property from incurring the full cost of managing their own stormwater. The

---

[19] The Commonwealth Court's opinion does not focus on the distinction between a public or quasiprivate capacity. Despite this potential oversight, this distinction is not absent from its decision. *See Borough of W. Chester*, 291 A.3d at 460 (quoting *Borough of W. Chester*, slip op. at 11 (discussing fee for service as performances within "quasi[]private capacity")); and *id.* at 465 (quoting *DeKalb*, 108 Fed. Cl. at 702 (stating that "core government services" are paid for by taxes)).

Borough's findings made in connection with the enactment of the Stormwater Charge, however, do not align with the Borough's current litigation position. Rather, these findings revolve around two foundational concepts: (1) the Borough's need to defray the cost of its own regulatory compliance as a public body; and (2) the negative impacts of stormwater on the general public.

The Borough Council established the Ordinance in 2016, purportedly under the authority provided by the SWMA, CWA, and The Clean Streams Law.[20] Section 94A-3(A.)-(D.) of the Ordinance. The Stormwater Charge originated from a report from the Stormwater Management Assessment Advisory Committee,[21] which "summarized the Borough's stormwater program needs and policy options for funding those program needs." *Id.* § 94A-2(O.). The Ordinance provides that "[f]ederal and state regulations require the Borough to implement a program of stormwater controls," including a requirement for the Borough "to obtain a permit and comply with its provisions for stormwater discharges from its [MS4]." *Id.* § 94A-2(L.). The Ordinance further provides that "[t]he Borough's streams have been designated as impaired by PADEP," which requires increased stormwater management measures for the Borough.[22] *Id.* § 94A-2(N.). The Ordinance even goes so far as to define the Stormwater Charge as "an assessment levied . . . to cover the costs of constructing, operating, and maintaining" the Borough System "*and to fund expenses related to the Borough's compliance with PADEP NPDES permit requirements under applicable state law.*" *Id.* § 94A-5 (emphasis

[20] Act of June 22, 1937, P.L. 1987, *as amended*, 35 P.S. §§ 691.1 to .1001.

[21] Section 6 of the SWMA requires that each county "establish . . . a watershed plan advisory committee composed of at least one representative from each municipality within the watershed." 32 P.S. § 680.6(a). The committee is "responsible for advising the county throughout the planning process," including "coordinating the watershed storm[]water plans with other municipal plans and programs." *Id.* § 680.6(b).

[22] The CWA requires states to identify impaired watercourses and establish a "total maximum daily load" for certain pollutants. 33 U.S.C. § 1313(d)(1)(C).

added).  Additionally, the Ordinance requires that the Stormwater Fund will be used to fund, *inter alia*, "performance of other functions *or duties* authorized by law in conjunction with the maintenance, operation, repair, construction, design, planning and management of stormwater facilities, programs and operations."  *Id.* § 94A-9(B.)(4) (emphasis added).  Based on this plain language, it is indisputable that the Borough's stormwater management service is prompted, at least in part, by the federal and state mandates imposed on the Borough itself.[23]

As discussed extensively by the parties and the Commonwealth Court below, the Ordinance also includes several explicit findings of fact relative to the desired public benefits from the operation and maintenance of the Borough System.  The Ordinance provides that "[a] comprehensive program of stormwater management is fundamental to the public health, safety, and general welfare of the residents of the Borough" and inadequate stormwater management increases flood risks, negatively impacts the environment and water quality, "and threatens public health and safety."  *Id.* § 94A-2(D.)-(F.).  Contrary to the Borough's present assertions, these findings do not indicate an intent on behalf of the Borough to benefit individual landowners of developed property by managing their stormwater runoff.  Rather, they reflect an intent to address the negative impacts of stormwater runoff on the environment and community, *i.e.*, to

---

[23] Federal regulations define small MS4s as those separate storm sewers that are: "[o]wned or operated by the United States, a State, city, town, borough, county, parish, district, association, or other public body (created by or pursuant to State law) having jurisdiction over disposal of sewage, industrial wastes, storm[]water, or other wastes."  40 C.F.R. § 122.26(b)(16)(i).  The definition is not limited to governmental entities, however, as the regulations explicitly "include[] systems similar to separate storm sewers in municipalities, such as systems at military bases, large hospital or prison complexes, and highways and other thoroughfares."  *Id.* § 122.26(b)(16)(iii).  In fact, *amici curiae* raise questions about whether Appellees, as non-municipal MS4 permittees, alleviate or are excluded entirely from the Borough's regulatory burdens.  (*See* CSR & Dura-Bond Br. at 22.)  As it is not necessary to the disposition of this case, however, we do not offer any resolution of these questions at this juncture.

protect the public health and safety of its residents. This noble pursuit, which is central to most, if not all public services, cannot be separated from the function of government. By its very nature, stormwater impacts all properties, not just developed properties, and the benefit received from the Borough System (in the form of the management of stormwater flowing from a particular property) is a benefit that inures to the general public more so than to the owner of the particular property from which the stormwater flowed. For this reason, and because of the statutory and regulatory duties imposed upon the Borough, it is clear that the Borough provides stormwater management services in its capacity as a public, rather than corporate, body.[24]

Further supporting the conclusion that the Borough is acting in its public capacity is the apparent lack of a contractual relationship between the Borough and the landowners subject to the Stormwater Charge. As explained above, where a municipality acts in a quasiprivate capacity, an individual's obligation to pay a fee for service "rests either on express or implied contract on the part of the consumer to make compensation for [the service] which he has applied for and received, on the terms and conditions made public." *Jolly*, 65 A. at 811 (citation omitted). There is no evidence of any express contracts establishing the Borough as the provider of stormwater management services

---

[24] The Borough's reliance on the Ordinance's credit system does not resolve this apparent inconsistency between the purposes provided in the Ordinance and those maintained by the Borough throughout this appeal. In fact, as implemented, the credit system suggests a preference for placing the Borough's burden of managing stormwater under the CWA and the SWMA onto developed property owners by incentivizing them through the credit system to manage their own runoff. Relief from this municipally imposed—or perhaps redirected—burden does not present the kind of service characteristic of a fee. Furthermore, the Ordinance explicitly provides that it "does not imply that property subject to the fees and charges established herein will be free from stormwater flooding or flood damage" and that payment of the Stormwater Charge "does not relieve a property owner from any local, state or federal requirements to obtain flood insurance or other laws applicable to the property." Section 94A-13(A.) of the Ordinance. Accordingly, the relief the Ordinance does afford is limited by the terms of the Ordinance.

for Appellees. Accordingly, there must be some form of implied contract to uphold the Stormwater Charge as a fee for service. In the context of stormwater management, however, there are several difficulties with recognizing implied contracts between the owners of developed property and the municipality in which they reside.

First, stormwater management services are not the kind of service that all property owners would seek out. By its nature, stormwater is transient and whatever amount does not filtrate naturally into the ground typically runs off the property. Unless that runoff poses an immediate risk of tort liability or damage to their own property, property owners typically do not need to consider the problems it poses once stormwater flows from their properties. This issue is compounded further where the properties that lead to the greatest proliferation of runoff are not the same properties that will suffer the greatest consequences. It is unassailable that the level of stormwater management needed to prevent disaster is tied to the specific characteristics of each property—and this calculus cannot be limited solely to the impervious surface area. As the Federal Claims Court explained in *DeKalb*:

> There may be properties, for example, that impose significant burdens on the stormwater system while deriving no substantial benefit from that system (*e.g.*, a property with extensive impervious coverage that is located on the top of a hill). Similarly, there may be properties that have little impact on the stormwater system that receive substantial benefits from that system (*e.g.*, a small home on a large, otherwise undeveloped lot that is located downhill from extensive development).

*DeKalb*, 108 Fed. Cl. at 703. As is evident from these examples, the burdens caused by uncontrolled stormwater are not always, or even usually, incurred by the property where the rain first fell. Rather, those pains are felt by the neighboring property that receives the redirected runoff. This disconnect between the developed property responsible for the proliferation of runoff and the damage to properties or ecosystems downstream is one reason that public participation in stormwater management is critical to its success. *See*

Section 94A-2(K.) of the Ordinance ("Public education on the control of pollution from stormwater is an essential component in successfully addressing stormwater."). Such an imperative service does not lend itself to a voluntary, contractual relationship on the part of each individual property owner.

Second, unlike the sale of a commodity or the use of sanitary sewer services, there is no apparent action by a property owner that would instigate each use of a stormwater system. Surely, it cannot be said that Appellees have caused the rain to fall. So, instead, the Borough relies upon the existence of impervious surfaces to establish Appellees' assent to the Stormwater Charge.[25] Specifically, the Borough argues that "each property owner makes the choice as to whether its parcel is a [d]eveloped parcel by virtue of the impervious area at that lot or whether it drains outside of the Borough." (Borough's Br. at 44.) While this may be true, the Borough disregards the expansive definition of "developed" provided in the Ordinance, which includes all properties "where manmade changes have been made which add impervious surfaces to the property," including all buildings. *See* Section 94A-5 of the Ordinance. In other words, the Stormwater Charge is imposed upon, at least, all habitable properties within the Borough and any functional commercial property. Indeed, it appears the only way for a property owner to avoid the Stormwater Charge would be employing a private stormwater management system,[26]

---

[25] The Borough also relies on the existence of the credit system to establish the "voluntariness" of the Stormwater Charge. The existence of such a system, however, is insufficient to establish a contractual relationship between the municipality and developed landowners. Requiring property owners who became subject to a unilaterally imposed stormwater charge to seek an appeal to avoid that charge is not equivalent to the individual or entity deciding in the first instance to accept or decline a service or engage or refrain from a regulated activity.

[26] Even in this circumstance, the landowner would need to seek out credits to avoid the Stormwater Charge. As explained *supra*, this available alternative does not establish assent to a unilaterally imposed charge.

removing all existing impervious surfaces and refraining from any development whatsoever, or moving outside of the Borough entirely.

The Borough's simplistic approach to this consent problem also fails to grapple with the historic context of the time when many properties were first developed. "Long before we worried about stormwater and impervious surfaces, people just built structures and roads, and there was no stormwater system. Rain was just rain[.]" Wilson, *supra*, at 78. With this understanding, it would be inappropriate to rely upon the initial construction of impervious surfaces to establish a contract between the parties to pay a charge that was not imposed until decades, if not a century, after the property was first developed. Finally, to the extent that the Borough relies upon Appellees' recent developments of the North Campus, refraining from further development of their property would not save Appellees from the Borough's imposition of the Stormwater Charge.[27] Appellees would still have to remove the existing structures.

Moreover, the Borough's attempts to manufacture assent on the part of Appellees fail to account for the sweeping terms of the Ordinance. Section 94A-6(A.) of the Ordinance provides that the Stormwater Charge is "imposed upon each and every

---

[27] Additionally, Section 13 of the SWMA specifically addresses the mitigation efforts required for new development. It provides:

> Any landowner and any person engaged in the alteration or development of land which may affect storm[]water runoff characteristics shall implement such measures consistent with the provisions of the applicable watershed storm[]water plan as are reasonably necessary to prevent injury to health, safety or other property. Such measures shall include such actions as are required:

> (1) to assure that the maximum rate of storm[]water runoff is no greater after development than prior to development activities; or

> (2) to manage the quantity, velocity and direction of resulting storm[]water runoff in a manner which otherwise adequately protects health and property from possible injury.

32 P.S. § 680.13.

developed property within the Borough that is connected with, uses, is serviced by or is benefitted by the [Borough System], either directly or indirectly." Thus, under the terms of the Ordinance, there is no requirement that the property owner use the Borough System at all. The Borough need only believe that a developed property is, at minimum, indirectly benefitted by the Borough System to impose the Stormwater Charge.[28] This provision is understandable in theory; as discussed above, it is indisputable that the Borough System provides benefit to the entire community by mitigating flood risks, ensuring cleaner water, and preventing other environmental harms. There is, however, a stark difference between "actual use of" the Borough System and "the privilege of using" it, and this Court has rejected similar reasoning in the charges levied in the context of sanitary sewer service. *See In re Petition of City of Phila.*, 16 A.2d at 34-35 (rejecting applicability of fee for sewer service where it applied to "all those to whom it is made available by its presence," including, *inter alia*, vacant lots and buildings "connected to the sewer system but not using it" and "all properties directly or indirectly discharging surface water into the storm sewer system"). Stated simply, the Ordinance permits the imposition of the Stormwater Charge *in invitum*, "without any regard whatever to the extent or value of the . . . [service], or whether any [service] is made." *Id.* at 35. The Borough's arguments to the contrary do not establish a contractual relationship for service but, rather, indicate compulsory payment for almost all those property owners residing or operating in the Borough.

---

[28] Justice McCaffery criticizes our emphasis on the "indirect" benefit language of the Ordinance. (Concurring and Dissenting Op. at 8-9 (McCaffery, J.).) He would, instead, focus on the direct benefits afforded to the properties within the Borough. Regardless of the focus, however, the point remains the same—the Ordinance imposes a compulsory charge upon almost all properties within the Borough. Such sweeping terms are, generally, not indicative of a voluntary, contractual relationship between the parties. Rather, they are more aligned with a local tax.

For all of these reasons, we conclude that the Borough is providing stormwater management services out of duty, for the public benefit, and in the absence of a contractual relationship. Consequently, the Borough performs its stormwater management services in its public capacity, rather than a quasiprivate capacity, which renders the associated Stormwater Charge a local tax. We conclude our analysis here, because, as explained above, a court need not reach the second step of the fee framework if it concludes at the first step that the municipality provides the service in its public capacity. The issue of proportionality arises solely in the context of quasiprivate activity, where the "obligation to make payment rests upon contract." *Id.* at 34.

### III. CONCLUSION

Our decision today does not rest on public policy but on the tested and well-settled tenets of local taxation. At the same time, we acknowledge the difficulties encountered by municipalities in navigating the regulatory landscape and the environmental problems posed by unmitigated stormwater, and we do not diminish the value provided by these services or the impact of our decision.[29] Notwithstanding, we must adhere to those basic principles that define taxation. In this regard, the law is clear: Where a municipality is duty bound to provide a service for the public benefit and in the absence of a voluntary, contractual relationship between itself and those receiving the service, the associated charge is a tax. For the reasons provided, we conclude that the Stormwater Charge embodies each of these characteristics. Accordingly, we hold that the Commonwealth

---

[29] In his concurring and dissenting opinion, Justice McCaffery focuses heavily on the perceived unfairness of our decision and criticizes our "fail[ure] to consider the corresponding impact" on the communities surrounding the University. (Concurring and Dissenting Op. at 7-8 (McCaffery, J.).) We reiterate that we do not take this decision lightly and recognize that "we must be exacting when discerning the proper distinctions between . . . these funding resources." (*Id.* at 3.) Our decision, however, must be based on the law, and not what we as individual Justices believe is or is not "fair." (*Cf. id.* at 5 ("[P]erceived 'fairness,' alone, cannot be the driving factor in this Court's decision."); *id.* at 13 ("'[F]airness' alone cannot be . . . the basis for our disagreement with the Majority.").)

Court properly held that, as a matter of law, the Stormwater Charge constitutes a tax from which Appellees are immune.  We, therefore, affirm.

Chief Justice Todd and Justices Dougherty and Mundy join the opinion.

Justice Mundy files a concurring opinion.

Justice Wecht files a concurring and dissenting opinion.

Justice McCaffery files a concurring and dissenting opinion in which Justice Donohue joins.